**BUTKIN PRECISION MANUFACTURING CORPORATION**

v.

**The UNITED STATES.**

**Nos. 641–71 and 484–73.**

United States Court of Claims.

Oct. 20, 1976.

---

Edward A. Lenz, Washington, D.C., attorney of record for plaintiff. Numa L. Smith, Jr., James W. Midgley, and Miller & Chevalier, Washington, D.C., of counsel.

Gerald D. Freed, Washington, D.C., with whom was Asst. Atty. Gen., Rex E. Lee, Washington, D.C., for defendant.

Before NICHOLS, KASHIWA and KUNZIG, Judges.

## OPINION

NICHOLS, Judge:

This is a renegotiation proceeding in which plaintiff's profits for fiscal years 1968 and 1969 are at issue. The Renegotiation Board determined that plaintiff had realized excessive profits in the amount of $350,000 in its fiscal year ended July 31, 1968, and $325,000 in the following 1969 year. The record does not include any statement of the Board's reasons. This action was commenced as to fiscal year 1968 by a petition, in the United States Tax Court. Thereafter, on July 27, 1971, it was transferred pursuant to Pub.L.No.92–41, § 3, 85 Stat. 97 (1971). A similar action was filed in this court seeking a *de novo* redetermination of the Renegotiation Board's finding concerning fiscal year 1969 (Ct.Cl.

**502**

No. 484–73). The two cases were consolidated for trial. In this *de novo* proceeding, defendant asks the court for a redetermination that plaintiff's profits for fiscal year 1968 and fiscal year 1969 were excessive in a total amount of not less than $986,000, almost 50% over the Board figure, and judgment in favor of the United States in an equal amount, plus interest as provided for in § 105(b)(2) of the Renegotiation Act of 1951, as amended, (hereinafter cited as Act) 50 U.S.C. App. § 1215(b)(2). Plaintiff did not either pay the Board orders for the years in issue or file a bond to stay execution on the orders. On January 10, 1975, the court granted defendant's motion for judgment on its counterclaims, but this does not pretermit our redetermination as we now announce it. We are indebted to former Trial Judge Hal D. Cooper's able recommended opinion, proposing a determination of no excessive profits. We agree, but on other grounds.

I.

Plaintiff began as a small precision machine shop in 1954 when the plaintiff's president, and sole owner, John Butka, started producing parts with a few used machines in his mother's basement. In the next few years the business grew gradually as Mr. Butka's skill and ingenuity became known. In the late 1950's it began producing prototype parts for the T–53 and T–55 gas turbine engines being developed by the experimental department of the Lycoming Division of AVCO Corporation. These engines were subsequently used in various military helicopters during the Vietnam War.

By the early 1960's plaintiff's business was a mix of commercial work, low volume prototype work for AVCO and relatively high volume production of T–53 and T–55 engine parts for AVCO. In the mid-1960's, plaintiff decided to concentrate on production of engine parts for AVCO. As the American buildup in Vietnam continued during the plaintiff's fiscal years 1965 through 1967, the plaintiff correspondingly increased its investment in machinery,

equipment, and tooling, and devoted a major portion of its time and effort to engineering and development relating to the T–53 and T–55 engine program and AVCO's increasing need for parts for those engines. The plaintiff grew from 34 employees in 1962 to 88 in 1967 and 1968, reaching 115 during 1969. Its plant and facilities were expanded as well.

Its sales peaked in 1968 and 1969 when the demand for parts for the T–53 and T–55 engines reached its peak. By that time nearly 100 percent of the plaintiff's business was renegotiable work with AVCO, and largely represented production of T–53 and T–55 aircraft engine parts. This involved working unusual and difficult metals such as titanium, to tolerances as low as 1/10,000 of an inch.

On renegotiable sales of $2,290,821 in 1968, plaintiff realized profits of $714,818, a rate of 31.2 percent, and on renegotiable sales of $2,823,448 in 1969, plaintiff made a profit of $787,075, a rate of 27.8 percent of renegotiable sales. Plaintiff proposed some adjustment to those figures but we adhere to them for reason to be stated. In 1970, as demand for the T–53 and T–55 engines declined, plaintiff's profits plummeted to 1.6 percent of sales. In 1971 and 1972 it sustained losses of 31 percent and 13 percent on sales, respectively.

Plaintiff has established that almost all of its work with AVCO in 1968 and 1969 was on a firm fixed price basis and that its contracts were awarded on the basis of competitive bidding. It was one of the top 25 or 30 suppliers of precision engine parts to AVCO. Its prices in fiscal 1968 and fiscal 1969 averaged approximately 11 percent lower than its prices during fiscal 1967. AVCO computed plaintiff's prices to be, on the average, 10 percent lower than the next higher bidder in fiscal 1968, and 16.7 percent lower than the next higher bidder in fiscal 1969. The record amply demonstrates that, during the period of peak demand in 1968 and 1969, plaintiff responded by consistently producing a wide variety of

engine parts in less time, at lower prices and with higher quality than any of its competitors. In large part, this was the result of plaintiff's gamble in earlier years when it expended sums in tooling (findings 9, 10), its superior technical ability and know-how and plain hard work.

Defendant concedes that plaintiff is entitled to favorable consideration for the risk plaintiff assumed in expanding, with its own funds, its productive facilities over the years, for its above-average contributions to the defense effort, for its above-average efficiency, for its effectiveness in controlling costs, and for the complexity of the work it performed. In addition to these statutory considerations, 50 U.S.C. App. § 1213(e)(1)–(6), plaintiff has also shown that it purchased its own materials and equipment (*i. e.*, it did not use Government-furnished materials or equipment), that it provided its own capital, and that it subcontracted only a small portion of the work.

## II.

Against this impressive record of achievement by a small enterprise, defendant through its expert, Professor E. J. B. Lewis, relies on two analytical approaches, together with comparative industry data, in support of its burden, *Lykes Bros. S. S. v. United States*, 459 F.2d 1393, 198 Ct.Cl. 312 (1972), of establishing that plaintiff's profits were excessive. Both analyses proceed from the premise that the period 1962–1964 represents, in plaintiff's corporate history, an historical norm against which its profits in the review years are to be measured. The analysis on which defendant principally relies is the incurred cost approach in which an average profit as a percentage of incurred costs is computed for the years 1962–1964 (in this case it is 7.089 percent), and applied to the dollar amount of incurred costs in the review years to establish a permissible profit for the review year. The other analysis is the return on capital approach in which the average percentage return on capital in the base years is computed (in this case 22.162 percent), and applied to the capital employed for renegotiable business in the review year to arrive at a profit figure.

Defendant's two analyses yield the following results:

| Incurred Cost Approach | FY 1968 | FY 1969 |
|---|---|---|
| Incurred costs | $1,612,817 | $2,053,764 |
| Normal profit (7.089% of costs) | 114,333 | 145,591 |
| *Return on Capital Approach* | | |
| Capital employed | 551,250 | 730,136 |
| Normal profit (22.162% of capital) | 122,168 | 161,813 |

Defendant excludes from the capital employed certain sums carried on the books as loans to Mr. Butka, the sole owner of the company.

In recognition of plaintiff's entitlement to favorable consideration under the statutory factors, defendant proposes to credit plaintiff with what it denominates a 20 percent risk bonus and a 50 percent profit bonus. The following computation incorporates these bonuses and demonstrates how defendant arrives at its conclusion that profits are excessive:

| Incurred Cost Approach | FY 1968 | FY 1969 |
|---|---|---|
| Normal profit | $114,333 | $145,591 |
| 50% profit bonus | 57,167 | 72,795 |
| 20% risk bonus | 57,805 | 68,541 |
| Total profit | 229,305 | 286,927 |
| Renegotiable profits | 714,249 | 784,531 |
| Excessive profits | 490,096 | 499,678 |
| *Return-On-Capital* | | |
| Normal profit | 122,168 | 161,813 |
| 50% profit bonus | 61,084 | 80,906 |
| 20% risk bonus | 43,985 | 50,936 |
| Total profit | 227,237 | 293,655 |
| Renegotiable profits | 714,249 | 784,531 |
| Excessive profits | 492,118 | 492,999 |

Defendant contends that corroboration for the conclusion that plaintiff realized excessive profits during the review years is to be found in a comparison of plaintiff's performance with that of the aircraft parts industry generally. Based on data from Statistics of Income, Corporation Income Tax Returns, a comparison of return on capital employed reveals:

| FY 1968 Return on Capital | Percent |
|---|---|
| Butkin | 132.5 |
| Aircraft Parts Industry | 12.8 |
| FY 1969 Return on Capital | |
| Butkin | 108.2 |
| Aircraft Parts Industry | 5.3 |

A comparison of return on net worth is as follows:

| FY 1968 Return on Net Worth | Percent |
|---|---|
| Butkin | 612.70 |
| Aircraft Parts Industry | 32.75 |

| FY 1969 Return on Net Worth | |
|---|---|
| Butkin | 304.30 |
| Aircraft Parts Industry | 12.10 |

In rebuttal to defendant's presentation, plaintiff contends that the comparative data from the aircraft parts industry does not provide a valid basis for comparison; that defendant's use of the years 1962–1964 as a base period is improper, and that defendant's own analysis, when viewed against a properly defined base period, shows that excessive profits were not realized.

Considering first the validity of the comparative data on which defendant relies, it appears that the data was drawn from only a small fraction of a very large group of companies that run the gamut from manufacturers of dirigibles to guided missiles, from cowl flaps to rocket motors. There is no way of determining how many, if any, machine shops were included in the sample on which the data is based, or whether any of the machine shops, assuming some were included, were of the kind doing precision work. Further, virtually all of the data in the Source Book on which defendant relies is marked with an asterisk, the Internal Revenue Service having used that symbol to indicate that there is a high sampling variability and that the data should be used with caution. Under these circumstances, comparison of this data with plaintiff's performance can only be, as defendant's expert described it, superficial at best.

■ Of course, merely because comparative data has some weaknesses is no reason to ignore it entirely. However, it is little more than useless in this case because the court has been provided with no standard by which to judge the results of the comparison. Defendant is contending for a result here which would leave plaintiff, according to defendant's calculations, with an after-redetermination return on net worth of almost 200 percent. Defendant offers no suggestion, no guidance, no clue by which one could divine how it is that a return of that magnitude is reasonable, when compared to an industry average of 30 percent, but a return of 300 percent, or 400 percent, or more, is indicative of excessive profits when compared with the same industry average. That these comparisons are of little significance is confirmed by the testimony of defendant's expert who stated that return on net worth and on capital were, in his opinion, "neutral factors" in this case. Defendant really and rightly abandoned reliance on capital and net worth as relevant factors when it allowed plaintiff even as much profit as it did. The statute does not prescribe their use to maintain a ceiling on allowable profits in all cases.

■ With respect to defendant's reliance on a base period of 1962–64 as being representative of an appropriate historic norm, trial judge Cooper also saw serious defects. The facts are that a substantially higher volume of commercial work was done in those years than in the review years; that much more low volume, pre-production and prototype work was performed in those years than in the review years; that only about one-half of the work in those years was the kind of production work performed in the review years; that in 1968 plaintiff performed a substantial amount of salvage work for AVCO which was a unique situation not found in the base years; that, due to the low volume prototype work, the expensed tooling costs as a percentage of sales were much higher in the base years than in the review years; that for the same reason the direct labor costs as a percentage of sales were much higher in the base years than in the review years. On these facts, he found it difficult to accept defendant's premise that the entirety of plaintiff's business in 1962–64 should be viewed as a norm against which its high volume production activities in 1968 and 1969 are to be measured. Not only do the review years differ from the base years in volume of activity but also in the character of the activity. Thus, the profits derived in 1962–64 represent a composite of results from disparate

activities of varying degrees of profitability while those in the review years were derived from essentially a single activity.

He said that a better comparison under defendant's incurred cost approach would be to determine the profit realized in 1962–64 from operations that were the same or similar to those in 1968 and 1969, *viz.*, production-type operations, and use that profit, computed as a percentage of the costs incurred, to determine whether excessive profits were made. Similarly, in computing return on capital, a better comparison would seem to be one based on plaintiff's earnings from production operations and only those assets employed in that production work both in 1962–64 and in the review years. That comparisons based on the same or similar operations are the more relevant is also confirmed by Renegotiation Board Regulation (RBR) § 1460.2(c), 32 C.F.R. § 1460.2(c) (1974):

> *Comparisons.* In evaluating the contractor's performance, comparisons will be made with the prices, costs and profits of other contractors engaged in the production of the same or similar processes.

(Also, see RBR § 1460.10(b)(2). Board Regulations are published in 32 C.F.R., Chapter XIV, Subch. B. They are cited hereinafter by reference only to the Board's section breakdown. As to the effect of such regulations upon proceedings in this court, see fn. 13 in *Mason & Hanger-Silas Mason Co. v. United States*, 518 F.2d 1341, 207 Ct.Cl. 106 (1975). Neither party has challenged any of them in this case.)

A comparison of results from production work in 1962–64 with plaintiff's performance in the review years revealed to Judge Cooper a much different picture than that painted by defendant. Plaintiff has shown that, on a sampling of 25 production orders in 1962–64, selected by defendant, it was realizing a profit of approximately 27 percent of sales. That figure compares favorably with plaintiff's profit on sales of 31 percent in 1968 and 27 percent in 1969, particularly when plaintiff is credited for the greater risk and its higher efficiency in those latter years. This comparison would strongly suggest that, if the base period's profits were reasonable, then so also were those in 1968 and 1969.

Plaintiff's profit on that work, expressed as a percentage of incurred costs, was 36 percent, a figure drastically different from the 7.089 percent figure calculated by defendant based on plaintiff's entire mix of business. By using 36 percent in defendant's incurred cost analysis, and crediting plaintiff with the 50 percent and 20 percent bonuses advocated by defendant's expert, it appeared that plaintiff's reasonable profits for 1968 and 1969 would have been $928,726 and $1,177,573, respectively. Its actual profits were, of course, well below those figures.

■ While we appreciate the force of these arguments, the fact still remains that plaintiff *was solely a precision machine shop* both in 1962–64 and in 1968–69, and chiefly a subcontractor to AVCO in both periods. The change was essentially from low volume to high volume orders for similar items, as AVCO shifted from a peacetime to a wartime production rate, and as civilian customers of Butkin were dropped. That the high volume orders were more profitable to fill, than low volume orders, is precisely the situation Renegotiation was invented to deal with. Experience in several wars has shown the tendency for unit prices not to decline as fast as the volume increase would justify. The Regulation, RBR § 1460.10(b)(2), allows consideration of profits even on non-renegotiable products, where similar, for comparative purposes. Here, however, the 1962–64 profits were non-renegotiable only because of the $1,000,000 floor. Act, § 1215(f)(1), as amended. Every renegotiation needs a "starting point" somewhere, if a determination is to be informed and reasoned. Base period profits are often the best "starting point" available. A wooden adherence to the average base period profit rate of 7.09 percent here would shock the conscience, but defendant has never contended for that. We agree with defendant that it should be used as a "starting point" to determine a rate of permissible, non-excessive profit,

with appropriate upward or downward adjustment as consideration under the statutory factors may require. We differ with defendant as to the amount of upward adjustment necessary. In this case, defendant has suggested no downward adjustment, nor do we.

### III.

■ The first factor we consider is "Efficiency". Defendant would allow $57,167 as a bonus for "Efficiency", lumped with "cost control" and "contribution" to the defense effort, for 1968, and $72,795 for 1969. These figures are inadequate for "Efficiency" alone. Quality and quantity must be rated high, and a steady reduction in unit costs occurred in the review years. The trial judge found that plaintiff lowered its 1967 price about 11 percent and that AVCO computed its prices as averaging 10 percent below the next higher bidder in 1968 and 16.7 percent in 1969, (Finding 17). Congress lays special weight on efficiency, saying it must be given "Favorable recognition." Act, § 1213(e). It is easy to see that a wooden adherence to a preconceived profit rate, such as the 7.09 percent rate here, would penalize efficiency. It is easier to conceive that a rate exists that would tip the scale and make efficiency more profitable, even after renegotiation, than inefficiency. It is harder to determine what the rate should be in face of the thin record we have here.

■ Defendant complains that Finding 17 is based on hearsay evidence, to which it made timely objection. It appears to be based on reports by Government officials to the Renegotiation Board, in the regular course of their and its business. See, Pub.L. 93–595, 88 Stat. 1926, Rules 801(d)(2) and 803(8). We must presume the trial judge found that the circumstances warranted use of this material. A more detailed comparison of plaintiff's operation with that of other suppliers (and in no instance or virtually none was plaintiff a sole source) would be of inestimable value, and we find it strange that defendant did not supply it, in view of the time FBI agents spent preparing the case, not counting overtime, 206 agent days, according to Mr. Lewis (Tr. 384). If we assume AVCO knew as much about its other suppliers as it did about plaintiff, as the evidence shows, the agents need have gone no further. We do not think that defendant, who had the burden of proof, is in a position to complain about the thinness of the comparison evidence. That evidence enables us to suppose that AVCO, and therefore the Government, saved 10 percent on plaintiff's sales to AVCO in 1968, or $229,082, because it had the efficient Butkin to deal with, in addition to others, and by the same reasoning it saved 16.7 percent on plaintiff's sales to AVCO in 1969, or $471,515. See Findings 5 and 17. It would seem reasonable that a 50 percent share of these savings would no more than suffice to make efficiency more profitable than inefficiency. We have not been given the means for any but the roughest calculation, and ours is probably on the low side because it fails to allow anything for benefits conferred by efficiency but not quantifiable in money, such as expedited deliveries.

### IV.

We turn now to the factor, "Reasonableness of Cost and Profits", Act, § 1213(e)(1), and RBR § 1460.10. It is evident that plaintiff kept its apparent costs high in the base period, and through its fiscal 1967, and its profits correspondingly low, by expensing the costs of assets that were of a durable nature and were used in production in the review years. This boomeranged when the costs of 1968–69 were low and the profits high, at least in a forensic sense. The most notable example of this is the tooling. See Findings 10 and 25(a). In 1965 tooling expense reached the astounding total of 60 percent of sales, declining only to 52 percent in 1966 and 40 percent in 1967. Much of this was "hard" tooling that, contrary to the usual machine shop practice, plaintiff made sufficiently durable to be used in anticipated follow-up orders as well as the order for which it was made. Defendant says the table in Finding 10 includes "soft"

as well as "hard" tooling, but, to the extent this is so, it only accentuates the misfit between the years in which the cost of "hard" tooling was expensed and the years in which the same tooling generated production. A transfer of $500,000 of tooling expense to 1968–69 would make the allocation more proportionate. According to RBR § 1460.10(b)(2), accounting adjustment cannot be made to offset deficient profits or losses in years not under review, against years that are, but by RBR § 1460.10(b)(5) the Board will give factor consideration to deficient profits in earlier years in some situations, e. g.:

> * * * Where it can be established that deficient profits * * * resulted from nonrecurring costs on renegotiable sales in the early stages of production which relate to production in the year under review, the Board will take this into account in reviewing the contractor's renegotiable business in the year under review * * *

It goes on to refer to cost of "special tooling" in the earlier period as an example of the cost misallocation it has in mind.

Plaintiff's process sheets also were assets of substantial value that were expensed in prior years but contributed largely to production in the years under review. Finding 20. No basis is given for an estimate of the cost of these sheets nor the amount, if any, of the financial adjustment that might be made. It is evident that, to some unknown extent, the process sheets made the profits misleadingly low in years before 1968–69, and misleadingly high in those years.

■ Butkin proposed four accounting adjustments that are apparently germane under this factor which would:

> *First.* Increase depreciation of machinery to reflect multiple shifts worked in the period under review.

> *Second.* Include the full cost of "special purpose" machines no longer required after loss of war business.

> *Third.* Defer until the review period a part of the salaries of Mr. Butka and three key subordinates paid in earlier periods, and the overhead allocable to them.

> *Fourth.* Charge an additional write-off of the undepreciated cost of equipment placed in storage in the summer of 1969 because no longer needed.

Defendant's expert rejected these adjustments as accounting adjustments, and we agree. He allowed three of them factor consideration and the "risk" bonuses he proposed, of $57,805 for 1968 and $68,541 for 1969, approximated the amount of adjustment he would consider appropriate for them. It would appear, however, that the proper factor to consider them under is "reasonableness of costs and profits". He rejected the salary adjustment for any purpose, we suppose rightly. Therefore, we deem defendant to have conceded factor adjustments for the reasons indicated, in the amounts stated, and there is no evidence that they are insufficient.

■ Thus plaintiff's allowable profits merit substantial upward adjustment under the factor "reasonableness of costs and profits", as indicated, the so-called "risk" bonus of defendant's expert being but a part of the necessary revision.

## V.

■ The next statutory factor is § 1213(e)(2):

> The net worth, with particular regard to the amount and source of public and private capital employed;

Unlike many small contractors, the plaintiff was not financed by its customers at all, not even by progress payments, though its billings were always promptly paid. There were no Government or Government-guaranteed loans. There was a modest amount of short-term bank debt up through 1968, but even that disappeared in 1969. Plaintiff essentially financed the necessary plant expansion with its own earnings. It would appear to have been over capitalized to the extent it was able also to loan substantial sums to Mr. Butka, its sole owner, for his personal purposes. It leased its plant facilities from Mr. Butka. (Tr. 64). This use of leased facilities the Renegotiation Board

has recognized to make net worth misleading or irrelevant as a guide to an allowable level of excessive profits. Hearings, Subcommittee on Appropriations, U. S. Senate, on H.R. 15572 (1975) 461–63. It would appear that to construct meaningful capitalization figures for factor analysis purposes, it would have been necessary to consolidate the assets and liabilities, employed or incurred in the business, by the plaintiff corporation and by Mr. Butka personally. Mr. Lewis, the defendant's expert, did not perform such a consolidation, nor did he display any belief that the capital and net worth were really meaningful as he computed them. It is, therefore, not clear why he used capital and net worth computations as an alternative basis for the determination he proposed. The expensing of important assets used in production is another reason why the involved figures are misleading. Furthermore, net worth would not be considered relevant to a purely personal service business, and yet here, the contribution by Mr. Butka's know-how was concededly so great that the corporate business of Butkin must be deemed at least partially of that character. It is not necessary to try to capitalize the contents of Mr. Butka's brain, to see they were an asset. Mr. Lewis noted that plaintiff's efficiency enabled it to do a large volume of war business in relation to its capitalization. In view of this, to penalize it for relative low net worth would be to penalize it for efficiency. A hypothetical less efficient company, requiring more fixed assets for the same production, would be unreasonably favored.

■ We have, therefore, considered the capital and net worth as the statute requires us to, but do not deem that they justify either raising or lowering the level of allowable profit, as computed by application of other factors.

## VI.

The next factor is Act, § 1213(e)(3):

Extent of risk assumed, including the risk incident to reasonable pricing policies;

We agree with Mr. Lewis that plaintiff's pricing policy did not expose it to risk. However, we do not agree in his rejection of plaintiff's 1971 losses as realization of risk incurred as a result of plaintiff's conscious decision, made before the years under review, to abandon all other business in order to maximize production for AVCO. (Tr. 518). It was always obvious that the nature of plaintiff's relationship to AVCO provided no safety in case of a sudden decline in AVCO's war orders. This occurred and had the financial effects on plaintiff shown in Finding 6. In retrospect Mr. Butka considered the dropping of Xerox and IBM "a bad mistake on my part" (Tr. 78). Mr. Lewis seemed to imagine that the decision was not creditable under the risk factor because it was made to maximize profits. Assuming this to be true, though there is no direct evidence for it, the risk factor was not designed to reward altruistic contractors only. It was based on the well known fact that persons who invest in a risky enterprise can command more return than those who invest in enterprises free from risk.

The Board says in RBR § 1460.12(b)(1): * * * In some cases a substantial degree of risk will be found in the temporary sacrifice of civilian markets to competitors, in order to accept more defense orders, * * * The Board will give special consideration to evidence showing risks through actual realization of losses incurred by the contractor in performing contracts in other years similar to the contracts undergoing renegotiation * *

This, like efficiency, is a factor that requires overriding recognition. In A. C. Ball Co. v. United States, 531 F.2d 993, 996, 209 Ct.Cl. 223, 230 (1976), the court explains the Congressional mandate, as it appears to be, and points out that even under the same regulation language as quoted above, Congress was not satisfied with the then ongoing application of the risk factor to actually realized losses. A large, diversified concern can offset any losses against current profits. The risk factor is often the sole protection of the small business concern against a

tunnel-visioned application of the fiscal year method of renegotiation to its profitable years only.

The profit of $31,340 shown for 1970, though only 1.6 percent of sales, can be disregarded as not being an actual loss and therefore not within the literal language of the regulation. As to 1971, a loss of $277,091 is shown, 31 percent of sales. AVCO was still the customer in 46 percent of this business.

■ Assume that $313,091 were added to 1971 receipts, with no change in cost, this would allow $36,000 in 1971 profit, within the range of the base years 1962–64 profits. Therefore, hypothetically, for factor analysis purposes, (and not as an accounting adjustment) in determining what profit is reasonable for 1968–69, $313,091 should be taken off those years' profits and reallocated to 1971. Arguably, a further sum should be reallocated for 1972. This we believe is what the Board undertook to do in the regulation quoted above. The defendant has not shown that plaintiff's 1971 and 1972 losses had any cause except realization of the risk that AVCO might lose its war contracts.

Since defendant made no allowance for this risk, and its so-called "risk bonus" is employed for other purposes, properly under another factor, the whole allowance we will make under the risk factor must be additional to defendant's adjustments.

## VII.

The next factor under Act, § 1213(e)(4) is:

> Nature and extent of contribution to the defense effort, including inventive and developmental contribution and cooperation with the Government and other contractors in supplying technical assistance;

Plaintiff claims credit under this factor for supplying without compensation, at AVCO's request, technical assistance to other subcontractors to AVCO, enabling them to produce the parts plaintiff produced, or some of them, which otherwise they could not

have done, though they were highly skilled machine shops and among AVCO's top 25 vendors. Finding 21. (See Tr. 83, 120 and ff.). Mr. Butka's testimony is specific and is not contradicted. The record does not enable a money value to be placed on this.

■ Finding 18 describes the program plaintiff undertook to rework 1,150 pieces of a part, which AVCO had spoiled in its own in-house operation. Plaintiff saved 952 such parts, at a price of $272,830. AVCO would have had to pay plaintiff $480 for each part new, or would have incurred cost of $625 per unit, making them in-house. Plaintiff saved AVCO and in turn the Government, between $184,130 and $322,170. In renegotiation, plaintiff might be rewarded with one-half the saving; however, the contract price should be deducted from the sales figure used in computing the reward for "efficiency". Say the credit should be $250,000 for the two years combined.

Findings 22 and 23 detail other creditable contributions. Defendant credits plaintiff with above average contributions, but its profit allowance or "bonus" lumped with that for efficiency and cost control, is inadequate for efficiency alone and thus we deem defendant has allowed nothing for contribution.

## VIII.

■ The next factor, and the last except for the unused one (RBR § 1460.15) is Act, § 1213(e)(5):

> Character of business, including source and nature of materials, complexity of manufacturing technique, character and extent of subcontracting, and rate of turnover;

The regulation, RBR § 1460.14 spells out that relative complexity and degree of integration are the dominant considerations here. The findings do not address this as directly as could be wished. In general, the proper test is value added. How much value did plaintiff add to the raw materials and services it purchased? For example, an assembler who merely put together complex parts and sub-assemblies purchased

from others, *e. g.*, one who put watch movements into watch cases, would not fare well under this factor. A number of clues in the record suggest that the value added was high, but this cannot be said to be well established and in particular, no material for comparison is available. Our ignorance as to what value added comparisons would show, is the main reason why the statistical data defendant has offered, as to earnings, capital, and net worth, in companies supposedly in the same line of work, is here meaningless. Defendant offers no basis for unfavorable evaluation at any rate. Plaintiff has of course shown clearly that the work was difficult, beyond the capacity of many machine shops, but we do not think that difficulty is *per se* what Congress had in mind. That the work often required a number of machining operations on the same part in sequence, is perhaps more to the point, but it would require to be developed.

Thus, in summary, plaintiff receives favorable consideration under several factors and unfavorable under none. Therefore, the raw base period earning percentage of 7.09 must be adjusted upward. The adjustments proposed by defendant are glaringly insufficient. If adjustments are made according to the suggestions offered *supra*, by additions to the starting point allowable profit set at the 7.09 percent rate, the result appears to be that the excessive profits are reduced to approximately $45,000 for the years 1968 and 1969 combined. The plaintiff receives clearances for both years, however, for two independent reasons. Under RBR § 1460.5(a) no refund will be required if the portion of the profits ascertained for each year to be excessive does not exceed $40,000. The factor evidence having been received in a consolidated trial, we do not think it would be other than arbitrary to allocate over $40,000 to any one year. The other reason is that defendant failed to sustain its burden of proof as to factor application, in particulars that will be explained.

At the trial, plaintiff presented first its *prima facie* case, as we required it to do in *Lykes Bros. S. S. v. United States*, 459 F.2d 1393, 198 Ct.Cl. 312 (1972). This consisted of a mass of business records and financial exhibits, plus testimony by Mr. Butka and others, tending to support its claim to favorable consideration under several statutory factors. Defendant argued in its briefs that this was not a complete *prima facie* case, though it had not moved to dismiss on that ground when plaintiff rested. It relied on the fact that plaintiff offered no expert testimony, and left its counsel to explicate how the testimony supported a clearance determination. On oral argument, defendant's counsel abandoned this position saying it was foreclosed by *Aero Spacelines Inc. v. United States*, 530 F.2d 324, 208 Ct.Cl. 704 (1976). This would seem correct, and the precedents of this court, here reaffirmed, are that the contractor's *prima facie* case does not have to be dismissed as insufficient because it does not include expert testimony. This is not to say that testimony by a qualified expert, for plaintiff, would not be very helpful to the court.

Under *Lykes* the burden now shifted to defendant, who undertook to sustain it with an expert. He conceded that plaintiff was entitled to favorable consideration under several statutory factors, pointing to none that were unfavorable. His quantification of the amounts, in dollars, these factors would require to be added to his "starting point" percentage of 7.09 percent, "bonuses" as he called them, was wholly inadequate, and indeed, added nearly 50 percent to the refund figures even the Renegotiation Board had proposed.

Confronted with claims to favorable consideration of this kind, defendant could either refute them or concede them. If it did the latter, as in several instances here, it would seem the burden of proof would require defendant to put a cap on the claim, *i. e.*, supply something to enable the court to determine its limits. Take, for example, Mr. Butka's claim that he gratuitously assisted other qualified AVCO subcontractors to produce parts they could not produce for themselves. This was clearly creditable un-

der the statute, as pointed out above. But there is nothing to show the quantities. If, for example, AVCO by this aid obtained $20,000,000 worth of parts from others than Butkin, that it could not have obtained otherwise, a very modest allowance for Butkin would practically subsume all other factor analysis and require a clearance all by itself. If, however, it was a matter of only $50,000 worth of parts, it would reflect favorably on Mr. Butka but would have no large effect on the determination. Since the burden of proof is on defendant, it would seem the court if left unaided is required to presume that the larger figure is the right one. It is hard to see what else the burden of proof could mean in this context. It would perhaps be different if the desired information were unreachable for defendant. However, as we have said, AVCO kept its subcontractors under a very close watch, and it seems obvious that the FBI agents who put in 206 days on the case could have obtained this information if so ordered. AVCO asked Mr. Butka for this assistance, and it would be most unlike a company of its kind not to know how effective the assistance was. Rather defendant elected the position that Butkin's processes were really very simple, and within the capacity of any expert machinist. If the trier of fact had believed this, of course, as to this issue, defendant's troubles would have been over, but he did not. We required plaintiff to put on its *prima facie* case, largely to safeguard defendant against being surprised by testimony of this kind, after it had rested.

If, as here, there are impressive claims for favorable factor consideration, conceded or supported by preponderating evidence, if they are readily quantifiable in nature, and if the record fails to provide such quantification, it would seem the party having the burden of proof must lose.

By a parity of reasoning, if defendant was not willing to let Finding 17 speak for itself as to the savings AVCO accomplished by dealing with Butkin, defendant was the party that should and could have obtained price and bidding comparisons, as to Butkin's fellow subcontractors for AVCO.

Any fact statements in this opinion may be regarded as additional findings of the court if they do not have counterparts in the formal findings. The judgment of the court is stated in the "Conclusion of Law" which follows the Findings.