**TOOL PRODUCTS COMPANY, INC.**

v.

**The UNITED STATES.**

**Nos. 32–72, 445–73 and 281–74.**

United States Court of Claims.

Dec. 13, 1978.

William C. Brashares, Washington, D. C., attorney of record, for plaintiff; Cladouhos & Brashares, Washington, D. C. of counsel.

Bruce G. Forrest, Washington, D. C., with whom was Asst. Atty. Gen., Barbara Allen Babcock, Washington, D. C., for defendant; Dennis G. Linder and Don W. Crockett, Washington, D. C. of counsel.

Before DAVIS, NICHOLS and SMITH, JJ.

OPINION

NICHOLS, Judge:

This consolidated case involves three petitions for redetermination of excessive prof-

its under 50 U.S.C. App. § 1218. It covers plaintiff's fiscal years ending August 31, 1966, 1968, and 1969, the fiscal year 1967 being omitted because settled. References to years herein will mean the company's fiscal years unless otherwise stated. The Renegotiation Board determined unilaterally that for 1966 plaintiff realized excessive profits to be eliminated in the amounts of $175,000, for 1968, $225,000, and for 1969, $150,000, in all cases subject to appropriate adjustment and credit for state and federal income taxes. Our duty is to redetermine these amounts de novo, not treating the board statements as proof of the facts or conclusions stated therein. The case has been tried before Trial Judge Wiese, who has submitted a recommended opinion and findings. While we find these able and informative, we have decided to state our conclusions in our own words. We adopt as our own, but do not print, the trial judge's fact findings. The parties do not identify any specific findings they except to. Fact statements in this opinion, not referring to his findings, are based on them and on the record, and may be regarded as additional findings by the court. We conclude that plaintiff realized excessive profits in the amounts of $35,000 for 1966, $127,500 for 1968, and none for 1969, all before the appropriate tax adjustments and credits. The conclusions of the board, the trial judge, and the court, are set forth in tabular form for comparison at the end of this opinion in Table B.

Plaintiff was a small, family-owned corporation, first incorporated in 1960, and located in Minneapolis, Minnesota. In the early 1960's its business was primarily custom tool and die making, its customers being industrial concerns. It also engaged in precision machining and performance of secondary or finishing operations on die casting made by others. Before 1966 its business, both renegotiable and other, was under $1,000,000 and therefore non-renegotiable. The total and renegotiable figures for 1966 both exceeded $1,000,000, and therefore plaintiff became subject to renegotiation, but a proceeding for that year was commenced after the later years, ap-

parently because the necessity for filing was overlooked. Plaintiff, beginning in 1964, commenced to expand into die casting. During the review period it was an integrated producer of various ordinance parts, mostly parts of bombs, performing all necessary operations from purchase of the raw material, through delivery of the finished part, ready for assembly in an ordinance item by a prime defense contractor. As regards its former specialty of tool and die maker, it continued this largely with itself as customer, with a nucleus of 35 highly skilled tool and die makers. Table A gives the total and renegotiable sales and profits, from 1963 to 1974, with percentage returns on renegotiable and non-renegotiable sales, subject to the necessary caveat that plaintiff had no cost accounting system, whereby the allocation of costs between renegotiable and non-renegotiable sales is too uncertain to form the basis of any meaningful comparisons. Plaintiff reached a peak of renegotiable sales of $2,098,006 in 1968, $2,737,-845 in 1969, and a return on renegotiable sales of 26.75 percent in 1968, 21.9 percent in 1969, with sharp declines to follow, losses being recorded in 1971 and after as the table reveals. The findings (78–99) detail the plaintiff's disastrous attempts to reconvert to civilian business, ultimately leading to its being effectively wiped out.

The board made salary disallowances for 1966 and 1968, which were allowed in the proceeding here. This is a large source of differences in the profit figures used. Defendant did not urge disallowances here, though it did urge that the rewards by way of salary to the persons in control of the company should be taken into account in applying the statutory factors, especially the risk factor.

Both sides introduced expert testimony which is of value in places, but in general unsatisfactory. It is too full of theoretical calculations and airy structures of speculation. There is too little solid fact which can be used as a basis of reasoning. Neither expert had any experience with renegotiation until shortly before preparing to testify, which is much like eliciting expert testi-

mony about the value of a piece of real estate from one who has never bought or sold a parcel of land. Since 1942, hundreds of persons have participated in the renegotiation of defense contracts and it is indeed strange none of them were used. Since the trial of this case antedates the warnings we gave in *Major Coat Co. v. United States,* 543 F.2d 97, 211 Ct.Cl. 1 (1976), defendant benefits from the lenience we promised as to trials that occurred before that date, October 20, 1976. Plaintiff is not asserted to have been the sole supplier of many of the ordinance parts it furnished, yet defendant in no instance supplied price and cost data as to the same parts obtained from other sources, as it easily could have done. Experts on both sides resorted to composite data obtained from the Internal Revenue Service "SIC" tabulations and, a novelty for these cases, reports taken from Dun and Bradstreet's *Key Business Ratios.* Details are in the findings. We have considered this data, and find it not very helpful because there is no way to adjust for differences between plaintiff's business and that of the alleged norms. Informed and reasoned renegotiation requires a clear focus on the uniqueness of the individual concern, which use of this kind of data tends to blur. It mocks the sanguine promises that proponents of renegotiation have so often made. We accept Dr. Mock's testimony for defendant, that derives from plaintiff's 1963–65 earnings a composite "normal" figure of 10.4 percent of sales, and we use it as a "starting point" in our analysis, with the caveat that the change already noted in the character of the business requires a corresponding adjustment in Dr. Mock's "normal" figure. We accept Dr. Donaldson's testimony for plaintiff that a key factor in the determination of a reasonable level of profit for the review years is the disastrous loss experienced in plaintiff's post-emergency effort at reconversion to civilian business. We are unable to treat it as the sole determinative. These matters are discussed more at length below in our factor analysis.

Neither witness indulged in the pedestrian but necessary business of going through the statutory factors one by one and applying each to the peculiar facts of this case, although Dr. Mock purported to allow credits or bonuses for favorable factors. The trial judge followed too closely the erroneous methodology of his witnesses, making a "special allowance" for risk as Dr. Donaldson recommended though in a lesser amount. Dr. Mock rightly states that there is a logical overlap in the factors, so credits or bonuses, or penalties if applicable, cannot be computed separately and cumulated to reach a result. Perhaps, rather, each factor will suggest a range of allowable profit that would be fair in view of that factor, considered separately, and the figure within all those ranges will be the right one. We conclude that the ratio of profit to sales was high and indicative of excessive profits, but we allow a larger profit as reasonable than did the board or the trial judge. Our determinations are set forth in tabular form in Table B at the end of this opinion. Our factor analysis follows immediately below. We defer "efficiency" to the end as the statute makes it paramount: by 50 U.S.C. App. § 1213(e), "favorable recognition must be given to the efficiency of the contractor or subcontractor," while application of the other factors is more permissive. We use it to test the adequacy of the result reached under the other factors. We take up the other statutory factors of § 1213(e) and the pertinent board regulations, 32 C.F.R. § 1460.8 and ff in order. The regulations have been neglected by the parties hitherto.

> Statute, § 1213(e)(1): Reasonableness of costs and profits, with particular regard to volume of production, normal earnings, and comparison of war and peacetime products;

By the regulation, § 1460.10, this requires comparison of costs and profits with those of the contractor of previous years and with the current costs and profits of *other contractors.* We may note the board says *other contractors,* not other tool makers. In view of the lack of *other contractors* in the record here, this contractor's previous history is selected for its "normal earnings" almost by default, but regard must be given the changes in product mix. In the first

review year, 1966, the renegotiable sales are almost four times those of the last "normal" year, while non-renegotiable sales have dropped, and stayed low thereafter. The contractor's entry into renegotiable business was accompanied by a shift into die casting and finishing, with a large increase in the ratio of "value added," the significance of which is dealt with under the factor: *Character of Business.* The 10.4 percent ratio of profit to sales of the "normal earnings" will, if unadjusted, be misleading because of this.

The board noted under this factor its view that the salaries paid to persons in control were excessive. Defendant says they siphoned off 30 percent of the profit. They appear to offset to some extent the otherwise low costs, but we note that it seems to be conceded that overall the costs were well controlled. Since here no disallowance was claimed or made, the high salaries are a factor only if they make the overall costs high, which they were not shown to do.

Where the contractor's defense business is in other products than those of the "normal" years, as here, the case cannot be called one where the emergency has created a high volume of sales of products previously sold at a lower volume, enabling an increase in sales without exceptional effort or corresponding increase in costs. This normally leads to lower unit costs, from which the government should benefit in lower prices. Rather it is one, where, still referring to the regulation, § 1460.10, factors related to the increased volume such as developmental contribution, or added risk assumed, may "entitle the contractor to claim a larger share of the benefit resulting from increased volume." Thus the 10.4 percent figure may be deemed under this factor to establish a floor rather than a ceiling.

Statute, § 1213(e)(2): The net worth, with particular regard to the amount and source of public and private capital employed;

The contractor was not dependent on government or customer financing and the regulation, § 1460.11 says the contractor is entitled to more favorable consideration when this is the case. Indeed, it may be doubted if the factor was meant to apply unfavorably to an instance of high value added as here, associated with moderate investment in facilities. Yet the board for all three years says the ratio of sales to capital and net worth was high, compared to average IRS returns (as to 1969 only) and indicative of excessive profits. We believe the fallacy of using these IRS figures is as great whether it is a matter of relating profit to capital and net worth, or to sales. If we suppose another contractor used double the facilities to produce the same volume, compared to this contractor, clearly it would be less efficient, and a higher cost producer, as its costs would include more depreciation and amortization, yet it would be entitled to more favorable consideration under the board's application of this factor, thus penalizing efficiency. Nor can plaintiff claim favorable consideration under this factor. *Camel Manufacturing Co. v. United States,* 572 F.2d 280, 215 Ct.Cl. 460 (1978). We treat this factor as neutral in its impact on this case.

Statute, § 1213(e)(3): Extent of risk assumed, including the risk incident to reasonable pricing policies;

The regulation is so important here as to require a direct quote:

§ 1460.12(b)(1): * * * In general, the Board will consider whether the contractor's performance of renegotiable business is free from risk, or subject to it, on the basis of actual experience and not mere speculative or unlikely possibilities. The Board will give special consideration to evidence showing risks through actual realization of losses incurred by the contractor in performing contracts in other years similar to the contracts undergoing renegotiation, * * *

Findings 78 and ff and Table A detail the unhappy results of plaintiff's business efforts in the reconversion period. While it might have done better in that period if it had pursued other alternatives, the trial judge was satisfied that its business decisions were reasonable and that the risks

thereby demonstrated to exist for a highly efficient and well managed company were inherent in taking on defense business of a type likely to cease when the emergency ended. We agree with him that the allowable profits of the company from defense business should, under the "risk" factor, include an element to safeguard against insolvency when defense business is lost. This conclusion seems unavoidable since reconversion costs after the period under review were allowed under the "risk" factor even when the company did not, as here, meet disaster, in *Blue Bell, Inc. v. United States*, 556 F.2d 1118, 213 Ct.Cl. 442 (1977). The board refused any allowance for this kind of risk in any year, and that is another difference between their analysis of the case and ours. Dr. Mock also, testifying for defendant in this court, declined to consider this risk on the ground it was hindsight, not foreseeable when the contracts here renegotiated were awarded, a ground clearly in conflict with the regulation above quoted. The authors of it clearly intended that actually realized loss should be taken as the best admeasurement of the degree of risks to be guarded against. The risk was enhanced because plaintiff was a small, family-owned company, and because of its small size, it survived on the fringes of its market. A well managed company in a similar line of business, Twin Cities Die Casting Company, was shown to have kept down its defense business and concentrated its operations largely in commercial undertakings. It had no reconversion problems and was prosperous at the time of trial. The trial judge allowed measurement of the risk in reconversion from commercial sales only, excluding the risk realized in the form of losses in the remnant of renegotiable business retained. This clearly does not agree with the regulation, which speaks of risk realized with "similar" contracts, and presumably the defense contracts were more similar than the commercial ones, or at least as similar. The trial judge allowed a bonus for risk of $199,461, to be spread among the three years involved. We think, if the matter is to be handled by a bonus, that figure is much too low. What is it worth to have your company wiped out, as occurred here? We would put the figure as not under $300,-000, and do not put a top on it at this point.

Statute, § 1213(e)(4): Nature and extent of contribution to the defense effort, including inventive and developmental contribution and cooperation with the Government and other contractors in supplying technical assistance;

The regulation, § 1460.13 expands on this, including the following:

(b) * * * (3) overcoming difficulties, which others have failed to overcome in providing materials or services for the defense effort; * * *.

The board allowed plaintiff favorable recognition under this factor for 1966 and 1969, but denied any for 1968, a curious distinction which we would not be justified in copying by anything in our record.

Plaintiff succeeded in many government ordinance jobs that other companies were either unwilling or unable to undertake. Thus, as an example, with two high-volume parts, a prime contractor, Scovill, made contact with 133 die-casting firms to ascertain possible interest with no restriction on price. Perhaps 20 or 30 responded favorably, but their interest was short-lived. The largest diecaster in the United States twice declined to make the part, and expressed doubt that the part could be made, or at least not by it, because it did not have toolmakers capable enough to make the small die-casting cavities that were involved. Thereafter plaintiff took the job and performed it with success.

Obviously this factor overlaps with efficiency, and separate bonuses for each would hardly be logical as a rule; however, it would appear that if other factors were neutral, plaintiff would earn 2 or 3 percent on sales over "normal earnings" as a bonus under this factor. The evidence seems to carry plaintiff beyond mere efficiency to inventive and developmental contributions in overcoming difficulties others could not overcome. Defendant has not provided the means to quantify this contribution and we can only suppose it was substantial. *Butkin Precision Mfg. Corp. v. United States*, 544 F.2d 499, 211 Ct.Cl. 110 (1976).

Statute, § 1213(e)(5): Character of business, including source and nature of materials, complexity of manufacturing technique, character and extent of subcontracting, and rate of turn-over;

The regulations, § 1460.14, point out a number of matters to be considered under this head. The key words for our purposes are: * * * The relative complexity of the manufacturing technique and the relative integration of the manufacturing process are the basic considerations in evaluating this factor.

As we pointed out in *Butkin, supra,* the key criterion thus is value added. The board determined this by comparing the material and subcontracts component of costs with the total cost of goods sold. For the three years the figures were in percentages:

|  | 1966 | 1968 | 1969 |
|---|---|---|---|
| Materials & subcontracts | 35.1 | 26 | 31.6 |
| Labor | 52.4 | 57.7 | 53.6 |
| Overhead | 12.5 | 16.3 | 14.8 |
|  | 100 | 100 | 100 |

As to 1966 the board said:

The Board recognized that the value added (labor and overhead) by the contractor, equal to 64.9% of cost of goods sold, was high and involved considerable skill and technical experience. The overall operations were well integrated with subcontracting equal to only 4.5% of the total cost of goods sold.

Comment on other years is the same but with the further comment that operations then became more repetitive. This overlooks that the value added ratio was higher than in 1966, 74 percent for 1968 and 68.4 percent in 1969. The simple proposition is that you are entitled to more profit on work you do yourself than on work done by others, who exact their profit in the sales price of your raw materials or components, and on whose profit yours will be cumulative. The regulations, to avoid discouraging small business, state that subcontracting to small business will not be penalized, but here plaintiff itself was small business. Here almost the whole material component was raw material. It should be noted that the cost of goods sold did not include the controversial executive salaries. The regula-

tion also refers to precision and skill required, which are conceded here to have been great. These matters, however, though important, are secondary.

The expert witnesses herein, and the trial judge, were inexplicably silent about value added. This is the one area where plaintiff fared better with the board than with the trial judge. The change in the degree of complexity, in the sense of added successive manufacturing operations instead of just one or two, that accompanied the change from the 1963–65 period to the review period, obviously make the 10.4 percent "normal" figure inadequate for the review period. We would venture the opinion that if other factors were neutral, the "character of business" factor would require adjustment of the "normal" figure to not under 15 percent on sales. This is supported by the estimated overall profit of Twin Cities Die Casting and the figure plaintiff itself used in contract negotiation.

We now turn back to the efficiency factor:

Statute, § 1213(e): * * * In determining excessive profits favorable recognition must be given to the efficiency of the contractor or subcontractor, with particular regard to attainment of quantity and quality production, reduction of costs, and economy in the use of materials, facilities, and manpower; * * *.

We have already mentioned that economy in the use of facilities must override the adverse impact of a low ratio of facilities, i. e., capital invested, to profit or sales. Clearly, too, the per unit profit after renegotiation must be greater for the efficient than for the inefficient producer: that is, if A can produce a widget at half the cost B does, award of a uniform ratio of profit to cost will penalize A for his efficiency, contrary to the statute.

The testimony in favor of this plaintiff's superior efficiency is unanimous by both parties' witnesses, and is acknowledged by the board. Part of the benefit of this was achieved in lower costs and part in the delivery of superior products, that might, but for plaintiff, have had to be redesigned

to suit the inferior skill and know how of other die casters. Plaintiff achieved the lowest possible rejection rates. Defendant's Dr. Trucks rated plaintiff in the top 4 or 5 percent of the industry as a diecaster, and even higher as a toolmaker. Findings 27 and ff deal with this. Other companies lacking plaintiff's toolmaking skills had to resort to costly secondary machining operations plaintiff could dispense with. The story of Scovill's rotor detonator and rotor housing is already told under *Contribution*. Scovill obtained some parts from a German source as well as from plaintiff. The German made deliveries on time and of excellent quality though not as good as plaintiff's, but the price was 70 to 80 percent higher. Plaintiff employed trimming and casting techniques which avoided the expense connected with deburring operations, which was substantial. With the lack of a cost accounting system, cost savings are difficult to quantify, but there is every reason to believe that they were substantial.

Defendant could have easily produced data as to prices at least, paid for the same parts supplied by competitors, but did not choose to do so.

If all the other factors were neutral, we would not be sure we had rewarded rather than penalized efficiency if we had not allowed at least 8 percent on sales over and above the 10.4 percent of the normal earnings period.

### Conclusion

We must not be frightened of high ratios of profits to sales. In *Butkin, supra*, this ran as high as 31.8 percent and 27.79 percent for the two years involved, yet we granted *Butkin* a clearance. It had going for it most of the things the instant plaintiff has, and some others besides. We do not think this plaintiff is entitled to a clearance, but we consider the board determinations excessive, as are those proposed by the trial judge to a lesser degree. Table B, attached hereto, is a summary of our decision tabulated with the board's and trial judge's. We think the board failed to follow correctly its own regulations, while the

trial judge paid too much heed to the opinions and calculations of his expert witnesses, and too little to the same regulations, which tell how determinations such as here involved are to be made.

The board regulation clearly sanctions recourse to hindsight in assessing the risk of financial disaster when a small company abandons the prudent policy of obtaining a wide range of customers for a variety of commercial products and delivers 80 percent of its production to one customer, the government, that may and in fact did cease its demand with relative suddenness. The contrast between plaintiff and Twin Cities Die Casting, one wiped out, the other prosperous, has no other explanation except the one obviously believed by our trier of fact, that plaintiff followed a risky course and Twin Cities a prudent one. If defendant insists on taking away in renegotiation the cushion its own procurement officers allowed plaintiff to accumulate against reconversion time, defendant will not be able to get small companies to aid in the defense effort again.

Strong favorable recognition, and we think cumulative with the risk allowances, should be given for efficiency and contribution. The change in the character of business, with added complexity and value added, warrants adding 4–5 percent to the "normal earnings," cumulative with the risk allowance.

The parties must have had in reach, but did not use, material that would have permitted a more precise evaluation. Defendant, with the burden of proof, must be the loser by this failure. It is possible that less than the 22 percent we propose for all three years could be shown to be sufficient, but defendant has not done so. Even treating efficiency and contribution as noncumulative, we have statutory duty to see to it that favorable recognition is given to efficiency, and we can feel no certainty we have done so awarding under 22 percent. On the other hand, the high figures of 24.5 percent and 26.75 percent on sales in 1966 and 1968 are indicative of excessive profits and not needed, we think, as rewards for

efficiency or cushion against risk. We note that the figure of 21.9 percent for 1969 represents some retreat in plaintiff's profit demands, when it was still to a degree "in the driver's seat" when dealing with customers, and operating at its highest volume. It indicates, by hindsight, which renegotiation is, that the profits for 1966 and 1968 were excessive.

Accordingly, we determine that plaintiff realized excessive profits in the amount, rounded off, of $35,000, for 1966, but as this is less than $40,000, plaintiff receives a clearance for that year by virtue of 32 C.F.R. § 1460.5. *Butkin Precision Mfg. Co. v. United States, supra.*

We determine that plaintiff realized excessive profits in the amount, rounded off, of $127,500 for 1968, and we clear plaintiff for 1969. The 1968 figure is subject to adjustment for state taxes measured by income, and to the statutory credit for federal income taxes. Plaintiff having filed a bond to stay execution rather than paying the board's refunds, judgment is entered for defendant in the above redetermined amount, less adjustment for state taxes measured by income and credit for federal taxes, and the cause is returned to the trial division under Rule 131(c) for computation of the said amounts.

DAVIS, Judge, concurring:

I concur in the result and generally in the court's opinion. I agree fully with Judge Nichols' basic method for determining the excessiveness of plaintiff's profits in the review years, as well as with his qualitative analysis of the individual statutory factors. But I am less sure of my position on the specific quantitative judgments the court posits at various points for additions to the "starting point" of a 10.4 percent profit on sales. I confess that I, for one, am "frightened" of high ratios of profits-to-sales in wartime procurement, in the sense that high ratios ought to induce us to give very exacting scrutiny. If I were the lone decider, I might well find excessiveness at a somewhat lower range than the court's 21.7%–22.01%—perhaps at a 19%–20% ratio, using (as does the court) 10.4% as the "starting point." These determinations are, however, all matters of judgment in the highest degree, and I am not affirmatively convinced that the court's figures are wrong. As Judge Nichols observes here for the court, this is another renegotiation case in which defendant carries the onus of proving that a lower ratio should be set, and has not done so. *See Manufacturers Service Co. v. United States,* 582 F.2d 561, 578, 217 Ct.Cl. ——, ——, (1978). Accordingly, I am content to accept the court's determinations for the three review years.

TABLE A

| | TOTAL SALES | Reneg. Sales | Non-Reneg. Sales | TOTAL PROFITS | Reneg. Profits | Non-Reneg. Profits | % Return on Reneg. Sales | % Return on Non-Reneg. Sales |
|---|---|---|---|---|---|---|---|---|
| 1963 | 472,321 | 307,927 | 164,394 | 41,718 | 27,722 | 13,996 | 9.0 | 8.5 |
| 1964 | 581,449 | 320,767 | 260,682 | 60,604 | 33,806 | 26,798 | 10.5 | 10.3 |
| 1965 | 759,311 | 334,919 | 424,392 | 86,999 | 39,070 | 47,929 | 11.7 | 11.3 |
| 1966 | 1,658,693 | 1,323,520 | 335,173 | 399,965 | 324,395 | 75,570 | 24.5 | 22.5 |
| 1967 | 2,381,000 | 1,971,000 | 410,000 | 576,000 | 472,000 | 104,000 | 23.9 | 21.8 |
| 1968 | 2,457,702 | 2,098,006 | 359,696 | 653,478 | 561,264 | 92,214 | 26.75 | 25.6 |
| 1969 | 3,299,840 | 2,737,845 | 561,995 | 717,311 | 599,168 | 118,143 | 21.9 | 21.0 |
| 1970 | 2,926,000 | 2,078,000 | 848,000 | 249,000 | 170,000 | 79,000 | 9.2 | 9.3 |
| 1971 | 2,067,000 | 1,096,000 | 971,000 | (111,000) | (65,000) | (46,000) | loss | loss |

| | TOTAL SALES | Reneg. Sales | Non-Reneg. Sales | TOTAL PROFITS | Reneg. Profits | Non-Reneg. Profits | % Return on Reneg. Sales | % Return on Non-Reneg. Sales |
|---|---|---|---|---|---|---|---|---|
| 1972 | 2,924,000 | 1,566,000 | 1,358,000 | 40,000 | (23,000) | 63,000 | loss | 4.6 |
| 1973 | 4,306,000 | 1,705,000 | 2,601,000 | (259,000) | 0 | (259,000) | 0.0 | loss |
| 1974 | 4,465,000 | 1,217,000 | 3,248,000 | (384,000) | 37,000 | (421,000) | 3.0 | loss |

TABLE B

| DECISION PER ------ | RENEGOTIATION BOARD | TRIAL JUDGE | COURT |
|---|---|---|---|
| FY 1966-Renegotiable Sales | $ 1,315,398 | $ 1,323,520 | $ 1,323,520 |
| Renegotiable Profit | 395,150 | 324,395 | 324,395 |
| Percent Return | 30 | 24.5 | 24.5 |
| Profit to be eliminated | 175,000 | 11,241 * | 35,000 * |
| Adjusted Sales | 1,140,398 | 1,312,279 | 1,288,520 |
| Adjusted Profit | 220,150 | 313,154 | 289,395 |
| Adjusted Percent Return | 19.3 | 23.8 | 22.5 |
| FY 1967 | Settled $ 250,000 | No petition | No petition |
| FY 1968-Renegotiable Sales | $ 1,942,140 | $ 2,098,006 | $ 2,098,006 |
| Renegotiable Profit | 535,012 | 561,264 | 561,264 |
| Percent Return | 27.5 | 26.75 | 26.75 |
| Profit to be eliminated | 225,000 | 221,458 | 127,500 |
| Adjusted Sales | 1,717,140 | 1,876,548 | 1,970,506 |
| Adjusted Profit | 310,012 | 339,806 | 433,764 |
| Adjusted Percent Return | 18 | 18.1 | 22.01 |
| FY 1969-Renegotiable Sales | $ 2,688,956 | $ 2,737,845 | $ 2,737,845 |
| Renegotiable Profit | 593,562 | 599,168 | 599,168 |
| Percent Return | 22.1 | 21.9 | 21.9 |
| Profit to be eliminated | 150,000 | 128,341 | None |
| Adjusted Sales | 2,538,956 | 2,609,504 | No adj. |
| Adjusted Profit | 443,562 | 470,827 | No adj. |
| Adjusted Percent Return | 17.5 | 18 | 21.9 |

* By virtue of 32 C.F.R. § 1460.5, determination below $40,000 is a clearance.