AMERICAN DIVERSIFIED CORPORATION and Jon-Dell, Inc.

v.

The UNITED STATES.

Nos. 592–71, 593–71 and 12–74.

United States Court of Claims.

Oct. 17, 1979.

Peter M. Kilcullen, Washington, D. C., for plaintiffs. Warren V. Ludlam, Jr., Jackson, Miss., attorney of record. Watkins, Pyle, Ludlam, Winter & Stennis, Jackson, Miss., and Kilcullen, Smith & Heenan, Washington, D. C., of counsel.

Lenore C. Garon, Washington, D. C., with whom was Asst. Atty. Gen., Barbara Allen Babcock, Washington, D. C., for defendant.

Before NICHOLS, BENNETT and SMITH, Judges.

## OPINION

NICHOLS, Judge.

In these Renegotiation Act cases, consolidated solely for trial, we make de novo redeterminations of excessive profits under 50 U.S.C. App. § 1218. The cases involve profits of American Diversified Corporation (ADC) for its fiscal years ended June 30, 1967 and 1968, and the profits of Jon-Dell, Inc. (Jon-Dell), a wholly-owned subsidiary of ADC, for its fiscal year ended March 31, 1967. All subsequent year references are to the fiscal years of the companies unless otherwise stated.

The Renegotiation Board determined that ADC had realized excessive profits of $1 million and $1,650,000 in 1967 and 1968, respectively, and Jon-Dell in the amount of $175,000, in all cases subject to appropriate adjustment and credit for state and federal income taxes. Jon-Dell is subject to renegotiation because it is under common control with ADC.

Trial was in Jackson, Mississippi before Trial Judge Spector, who substantially reduced the board's determination of excessive profits. He concluded that ADC received or accrued excessive profits of $276,-397 and $308,416 in 1967 and 1968, and the Jon-Dell's excessive profits totaled $103,682. The closing of proof occurred shortly before our decision in *Major Coat Co. v. United States*, 543 F.2d 97, 211 Ct.Cl. 1 and thus defendant continues to enjoy the lenient assessment of its performance in carrying the burden of proof, employed in that case and promised therein for cases already tried on that date, October 20, 1976. While we find the trial judge's opinion helpful and informative, and utilize it in some measure, we reach different conclusions. We adopt as our own, with appropriate amendments, the trial judge's fact-findings,[1] but do not print them. We conclude that ADC realized excessive profits of $739,536 in 1967, and $873,206 in 1968. Jon-Dell realized excessive profits of $137,988 in 1967. Statements of fact in this opinion may be taken as additional fact-findings of the court if they lack counterpart in the trial judge's findings.

ADC and Jon-Dell were engaged in what are commonly known as cut, make, and trim operations similar to those of the plaintiff in *Camel Mfg. Co. v. United States*, 572 F.2d 280, 215 Ct.Cl. 460 (1978).

From its formation in 1951 until 1960 ADC concentrated almost exclusively in the performance of government contracts subject to renegotiation. It manufactured a variety of heavy canvas tentage items, including tent liners, rope, and general purpose tents. There seems to be a difference in the facilities and expertise required for military tentage items that differentiates producers from those, otherwise similar, whose market is primarily civilian. When ADC was formed there were 25 to 39 active bidders in the government tentage field. After the Korean War, demand for military tentage decreased, and the number of tent manufacturers diminished to four or five, and these all suffered frequent "down" periods with no government orders. At that time, ADC attempted to expand into the commercial tentage field. The attempt failed, as ADC's facilities did not lend themselves to that market.

In 1960, ADC merged with Jones & Yandell Manufacturing Company in order to reattempt entry into nonrenegotiable business. The nonrenegotiable division of ADC showed a profit in the years 1963, 1964, and 1965 of 11.94, 8.53, and 7.31 percent, respectively. It capitalized on the boom in recreational camping. After 1965, however, the nonrenegotiable division consistently has shown a loss.

ADC's plant was located at Canton, Mississippi, a rural area, during and long before the period under review. The labor force had only such training as ADC gave it. As compared with other tentage producers, it worked at lower wages but required closer supervision.

Plaintiff Jon-Dell was incorporated in 1963 as Mize Coat Manufacturing Company, a wholly-owned subsidiary of ADC. Its

---

1. See our order of this date for the text of the modifications in the findings.

name was changed to Jon-Dell in 1968. It was also located at Canton, Mississippi, in an old, abandoned school. It manufactured all-weather coats, and performed no renegotiable business until 1965 when it accepted its first contract to manufacture tent liners. Its profit and loss statements for 1966 show a profit of 9.13 percent on sales for renegotiable business, and of 11.23 percent for nonrenegotiable business. It has previously realized a 2.21 percent profit on sales for its nonrenegotiable business in 1965, and sustained a loss in 1964.

With the advent of hostilities in Vietnam, government requirements for tentage increased in the mid-to-late 1960's, and heavy demands for tentage supplies were placed on the few remaining tent manufacturers. Table I illustrates this growth.[2]

In 1967, ADC and Jon-Dell reported profits of $1,342,505.46 and $230,475.48—17 and 28 percent of sales on renegotiable business. In 1968, ADC reported profits of $2,055,-868.72—18.69 percent of sales. We must determine whether these profits were excessive, and in what amounts.

During the review years, ADC primarily manufactured "General Purpose Medium" tents (GPM tents), and Jon-Dell concentrated on the manufacture of tent liners. In general, the two companies experienced similar market demands and manufacturing practices, such as the use of government-furnished material (GFM). Also, the management of the companies was the same. There were, however, some important differences in the manufacturing procedures and in the proofs offered by the companies to justify credits for factors delineated under the Renegotiation Act. *See* 50 U.S.C. app. § 1213(e). Our analysis for Jon-Dell thus parallels that for ADC, except when differences between the two companies warrant separate discussion.

I

A

We first review the accounting methods used by the plaintiffs to set forth their profits. We begin this discussion cautioning that it is plaintiffs' burden to prove "the accuracy of the financial data, including the segregation of the accounting on renegotiable business from nonrenegotiable business and the propriety of plaintiff's cost allocations under accepted accounting principles." *Lykes Bros. Steamship Co. v. United States,* 459 F.2d 1393, 1401, 198 Ct.Cl. 312, 326 (1972).

The first disagreement between the parties concerns the inclusion of GFM in determining the total volume of negotiable sales. For the renegotiated contracts under review here, the government required that plaintiffs use materials furnished by the government in accordance with the standard government-furnished property (GFP) bailment system provided in the contracts. Inclusion of GFM in costs and sales figures gives contractors a larger base from which their percentage returns will be calculated, and thus they hope will allow them more profit. In renegotiation cases, contractors always want to do this, but the board practice has been the contrary. As defendant's expert truly stated, whether this is done or not should in theory have no impact on the result in renegotiation. The parties do battle on the assumption shared by both sides, that it does matter greatly.

Since the GFM constituted approximately 50 percent of the amount of renegotiable sales for ADC, and 43 percent for Jon-Dell, the resolution of the issue could have a significant impact on our calculations. For example, the government estimates of profits as a percentage of sales varies as shown in Table II.

The GFM issue was addressed in *Camel Mfg. Co. v. United States,* 572 F.2d at 293–96, 215 Ct.Cl. at 485–91. There we also dealt with excessive profits resulting from manufacture of military tents and tent accessories during the Vietnam War. We took *Major Coat Co. v. United States,* 543

---

**2.** For greater convenience, all tables are assembled at the end of the opinion, following the conclusion.

F.2d 97, 211 Ct.Cl. 1 (1976), *rehearing denied,* 549 F.2d 196, 211 Ct.Cl. 49 (1977) as a standard, and attempted to determine "whether a GFP 'bailee' bore virtually the same burdens and derived the same benefits in the handling of the GFP as would a purchaser of raw materials." 543 F.2d at 106, 211 Ct.Cl. at 16. *See also Page-River-Curran v. United States,* 574 F.2d 1063, 216 Ct.Cl. 246 (1978) where we upheld the trial judge in refusing to add GFM to sales and costs. It is really a matter of which method is the most helpful, and where, as in *Page-River-Curran,* GFM is excluded, plaintiff is entitled to favorable consideration in factor analysis since he is entitled to some profit for managing the GFM.

In *Camel* we rejected the government's argument that 32 C.F.R. § 1499.1–24 (Renegotiation Rule No. 24) (1975), *required* exclusion of GFP. We held that we need not give that ruling the same deference as would be due a formally proposed and issued administrative regulation, especially as this court is empowered by the Renegotiation Act to try cases de novo. 50 U.S.C. app. § 1218. In addition, that ruling was issued in 1969, after the review years in question. Therefore we look to see if the facts of this case justify inclusion of GFM in sales and cost figures.

Defendant contends that a contractor enjoys advantages under a GFP procurement system that place him in a substantially better position than one who purchases raw materials independently. Use of GFM eliminates the need for major capital outlays and guarantees supplies of necessary materials in periods of shortages, as were the review years.

■ But we find that here, as in *Camel,* the GFP system is not without offsetting pitfalls. Much of the GFM was defective, there were delivery delays and mishaps, yet a GFP contractor like plaintiffs could not seek alternative sources of supply. The government was enabled to dispose of unsalable surplus. In this case, some of the GFM supplies were overage remnants from the Korean War, and more or less useless in meeting government specifications, but despite this problem the plaintiffs were held responsible for meeting those specifications. The contractor was required to account for GFM the government concluded it was not required to use. There were facilities for allowing credit for defective GFM, but contractors did not always believe themselves able to cover themselves fully for discarded defective material. *Camel* is the most similar decided case to this one, and it would indeed be strange to obscure the similarities by an inconsistent treatment of GFM, especially since it should not determine the result. Therefore, GFM will be included in sales and cost, except in instances when we compare plaintiffs' accounting data with those of another company which did not include GFM.

### B

The other accounting issue to be resolved is the disposition of the profits of ADC's truck division. The amounts in dispute are not large and have a minimal effect on the renegotiable profit figures and percentages as appears in Table III.

The Truck Division was formed in 1963 after unsatisfactory experiences with common carriers. It was designed to be a separate profit-making activity of the company. Since its formation, it has derived all its revenues from the other divisions of ADC, charging them the lowest common carrier freight (LCCF) rate. The other divisions recorded this rate charge as an operating expense. Net Truck Division revenues were the difference between actual incurred costs and the LCCF rate, and have always been allocated entirely to the Truck Division.

Defendant argues that a portion of this revenue must be allocated to renegotiable business, as it derives from renegotiable activity. It suggests allocating that portion of net revenue which equals the percentage of ADC's total business consumed in renegotiable activity.

Plaintiff contends that principles of consistency and fairness preclude this treatment. Truck Division revenues always

have been allocated to the Truck Division, and the Renegotiation Board never contested this methodology. Furthermore, the government was charged the lowest price rate, and ADC should be encouraged to continue this efficient practice by allowing the Truck Division to retain profits.

We agree with plaintiff that ADC's efficiency should be rewarded. However, that reward is better suited for disposition in our discussion of the statutory factors, and not in the initial allocation of net profits and revenues.

The trial judge suggested that the Truck Division activity is similar to an intercompany sale, which normally does allow a profit to the seller. But he notes that when the financial statements of affiliated companies are consolidated, the "profit" is merged. This "profit" cannot be siphoned off into a separate profit item on a consolidated income statement.

The trial judge suggests adjusting the Tent Division's selling expense account and the Truck Division's net revenue account so that the former reflects actual incurred costs and the latter does not include an interdivisional "paper profit." Based on the ratio of truck revenue derived from Tent Division business to total Truck Division revenue, the adjustments to the selling expense account and Truck Division revenue accounts are $81,316.06 for 1967 and $80,262.81 for 1968. This increases the renegotiable profits of ADC. This method of allocation was not objected to by plaintiffs, and it complies with the principles of allocation published by the Cost Accounting Standards Board. See CCH, *Cost Accounting Standards Guide,* "Cost Accounting Standards Board-Restatement of Objectives, Policies, and Concepts," ¶ 8032, May 16, 1977. In any event, the impact of our allocation will be minimal as we will reflect ADC's lowered costs and efficiency under the statutory factors discussed below.

## II

### A

A task more difficult than the accounting determinations above is selection of a start-

ing point from which to compute plaintiffs' reasonable profits. We outlined this problem in *Camel* :

Thus, in order properly to determine what profits of the renegotiated contractor, if any, were excessive and the result of the "suddenness of the wartime demand on the marketplace," this court must attempt to *"reconstruct"* some sort of normality from what is essentially an abnormal environment, the wartime marketplace. The basically theoretical nature of such an attempt at reconstruction often necessitates a "broad brush" approach to the entire matter, * * *. [Citations omitted—footnote omitted.] [572 F.2d at 297–98, 215 Ct.Cl. at 492.]

As Judge Kunzig further noted in *Camel,* this court has utilized a number of methods to define reasonable profits for renegotiable contracts. A "base or normal years" approach compares profits earned by renegotiated contractors in the wartime economy with profits earned in normal production years, see, e. g., *Tool Products Co. v. United States,* 589 F.2d 506, 218 Ct.Cl. —— (1978). Renegotiated contractors are also compared with their competitors, see, e. g., *Major Coat Co. v. United States,* 543 F.2d at 120, 211 Ct.Cl. at 41. In this case, we use the normal years as our starting point cross-check our results by comparison with profit levels of other competitors and the testimony of the parties' witnesses.

The record before us contains inadequacies. Both sides use opinion testimony to justify their contentions. One of defendant's major witnesses, Dr. (Dean) Edward Kaitz, presented an analysis which focused on the level of profits a company would need to justify exposing itself to a substantial risk by a growth in business, and obtaining working capital so far as possible by borrowing instead of in the form of profit. He asks what level of profits a rational entrepreneur would require before abandoning his normal caution and risking overspecialization in renegotiable business and the eventual cessation of government demand for his products. Dr. Kaitz's testimo-

ny is most interesting, but not particularly helpful to the court, as his analysis focuses on projected corporate goals, projected profits, and theoretical sources of capital from which the companies could draw. In addition, his methodology does not further the pedestrian but necessary task of evaluating plaintiffs' profits in light of the statutory factors required to be considered in renegotiation cases. It is not true he failed to discuss the factors, but he resorted to them chiefly to show they did not require him to modify his conclusions reached by other means.

Dr. Kaitz's expert testimony figured largely in *Dynasciences Corp. v. United States*, 214 Ct.Cl. 643 (1977). See discussion at 653 and ff. It will be noted that he there took a view as to his own qualifications that barred him from giving opinion testimony as to how to apply any of the statutory factors to the case, save only "reasonableness of costs and profits" and "capital and net worth."

We rely more then on the parties' other witnesses for necessary information about the nature of the government military tentage business and the competitive position of tent makers during the Vietnam era. However, we find that their testimony also has flaws, as many of their comparisons with other manufacturers and much of their testimony is based on data from 1966–1968, a time when government demand for tentage was especially heavy.

We also note here that the experts' analyses are sometimes based on return on cost, and at other times they refer to return on sales. We have made appropriate adjustments in our figures so that they are comparable to the ones under discussion.

Our comparison of ADC with its prior years is partially hampered by the fact that until 1966, ADC's underutilization of capacity and its complex product mix requiring a change in the production line for each contract resulted in extremely poor productivity and efficiency. Moreover, there were periods of "down time." Therefore its prior year profit levels were low. In addition, the trial judge notes that from 1962 to 1966

ADC received only three contracts for GPM tents, the product which constituted the bulk of ADC's work during the review years.

Plaintiffs and the trial judge urge that a comparison with the so-called "low profit" years of 1960–1966 would not be a valid one; instead, they rely on certain contracts they consider reasonably priced of 1967 and 1968 to determine a base level of profits. The trial judge argues that these profits were competitive, because the prices were reasonable as compared to other tent makers.

We agree that ADC's early sales years may understate the profit a "normal manufacturer" could earn in "normal years." On the other hand, it is the very increase in volume sales allowing greater and more efficient capacity utilization which brings government contractors a higher profit during periods of wartime demand. Increases in volume should result in lower unit costs, and the government, whose orders create the increased volume, is entitled to share in the lowered cost. But note that ADC and all major tent makers substantially increased prices during the 1966–68 period. Table IV compares the cut, make and trim (CMT) price increases by ADC and its competitors during the 1966–68 period.

The fact that both prices and profits increased dramatically over the "normal years" is an indication that the contractor has reaped benefits from wartime demand. They are indicative of excessive profits. The Renegotiation Act was passed to recover such gains. *Mason & Hanger-Silas Mason Co. v. United States*, 518 F.2d 1341, 1361, 207 Ct.Cl. 106, 139 (1975). And even though ADC's percentage price increases were lower than those of its competitors, note that its pre-1966 prices were the highest of all.

Use of the review years in the calculation of the average normal prices and profits with which those years are to be compared reduces the discrepancy between the normal and review years, and thereby defeats the purpose of the comparison. *Mills Mfg.*

*Corp. v. United States,* 571 F.2d 1162, 1170, 215 Ct.Cl. 536, 552 (1978). Therefore, we will not use the review years to determine "normal profits" but proceed in the manner described below.

Sales of GPM tents constituted approximately 82 percent of ADC's sales in 1967, and 70 percent of its business in 1968. Given the preponderance of GPM tent sales in ADC's total output, we lay great weight on the profit levels obtained from GPM sales in other years to determine "normal year" profits. ADC's total renegotiable sales, 1966 GPM tent sales, and profits on those sales are listed in Table V. Also included are costs of manufacture and profits as a percentage of costs.

No prior profitable year except 1966 involved the sale of GPM tents. However, to use only 1966 as a base year may distort the picture of a normal year. As can be seen from Table I, orders (but not necessarily sales and profits) of GPM tents reached a peak in 1966. There was some increase in demand and prices at that time. However, we do use that year as one of the base years since ADC's activities during that year most closely resemble the review years. This was the first year without the shattering impact of "down time" periods. We thus average profits and sales figures for 1965 and 1966 to determine "normal years" profits. We omit 1962, as that year involved small-scale contracts and many changes in producing items. The same might be said in part of 1965, but we include that year assuming such a disadvantage will be countered by the inclusion of 1966.

As illustrated by Table V, 1966 profits on GPM tents were in general lower than the profits on other renegotiable items. To arrive at a reasonable estimate of normal profits, we assume that this was general. This assumption is based on knowledge that GPM tents were extremely heavy and bulky, and from testimony of experts who described the manufacturing process of these items as difficult. See our discussion of "character of business" below.

To find a normal profit, then, we use two sets of figures. We determine the percent-age returns on GPM tent sales for 1966, and use that figure as the "normal" percentage return for 1967 and 1968. We also determine the percentage returns on all renegotiable items for 1966 and 1965. We then weigh these two sets of returns by the percentage of sales for GPM tents undertaken by ADC in 1967 and 1968.

ADC's "normal" percentage returns on GPM tents (derived from its 1966 returns on those tents) is 5.21 percent on sales and 5.49 percent on costs. The average percent returns on sales for all renegotiable items (derived from averaging returns for 1965 and 1966) are 6.78 percent on sales and 7.18 percent on costs.

In 1967, 82 percent of ADC's business involved the manufacture of GPM tents. We weigh the percentage returns accordingly.

$$.82 \times 5.21 = 4.27$$
$$.18 \times 6.78 = 1.22$$
$$5.49\% - \text{return on sales for 1967}$$

$$.82 \times 5.49 = 4.50$$
$$.18 \times 7.18 = 1.29$$
$$5.79\% - \text{return on costs for 1967}$$

In 1968, 70 percent of ADC's business constituted GPM tents.

$$.70 \times 5.21 = 3.65$$
$$.30 \times 6.78 = 2.03$$
$$5.68\% - \text{return on sales for 1968}$$

$$.70 \times 5.49 = 3.84$$
$$.30 \times 7.18 = 2.15$$
$$5.99\% - \text{return on costs for 1968}$$

We use the percentage return on costs to determine the base or "starting point" level of profits:

1967—5.79 × 6,524,631 = $377,776

1968—5.99 × 9,001,981 = $539,219

Compare these returns with the testimony of witnesses presented by the parties. Mr. John Lewis, plaintiffs' expert and a government tentage procurement officer for 16 years, presently employed in the private sector, started with a 12 percent return on the cost base *exclusive of GFM.*

That would result in allowable profits of $321,626 for 1967 and $401,380 for 1968. This analysis was based on comparative cost information derived from Renegotiation Board decisions regarding ADC's four major competitors for the Vietnam era. If GFM is added to the cost as he also proposed, and the 12 percent figure still applied then, of course profits would be much higher, about double the amount first suggested. He had been accustomed to excluding GFM from sales and costs when functioning as a government procurement officer, but subsequently had concluded this was wrong. He applied 12 percent to 75 percent of the GFM, following a trial judge decision in another case that this court afterwards overruled on the point. Left to himself, he would apply the 12 percent profit rate to 100 percent of the GFM. But this makes the 12 percent figure suspect in our minds. Lewis determined that level by examining former Renegotiation Board cases where reasonable profits always excluded profits on GFM. The average board award was 12.25 percent of sales, GFM excluded, and 6.13 percent of sales, GFM included. This of course was after application of statutory factors. We would assume that given the inclusion of GFM, the board would have lowered the profit rate. Mr. Lewis also testified that from 1962–66 the average profit for the industry was 6–8 percent on sales. While Mr. Lewis was knowledgeable of the industry and gave much useful testimony, we conclude that his 12 percent rate on costs including GFM would not even be substantial evidence for that figure.

Defendant's contracting officer and witness Mr. John Hurchik, suggested an 8 percent return on cost exclusive of GFM. That would result in a base profit level of $214,417 for 1967 and $267,586 for 1968. Hurchik did not testify that the 8 percent figure would remain the same if GFM were included. If the 8 percent figure is adjusted to include 8 percent of the cost of GFM the base profit would be $521,970 and $720,158.

Table VI shows dollar amounts of reasonable "base profits" before factor adjustment under our analysis and under that of the witnesses.

ADC's "reasonable profits" including GFM are lower than those suggested by the witnesses when GFM is included. But the "normal years" for ADC did show unexceptional profits. When faced with increased government demand, ADC met the challenge and opportunity with efficient management and planning. We will take this into consideration when we greatly increase ADC's "reasonable profits" via application of the statutory factors.

We must now determine a starting point for Jon-Dell. This is made more difficult than our analysis of ADC for a number of reasons. First, it is difficult to compare Jon-Dell to any competitors. Jon-Dell manufactured small tent liners, which from the record clearly were less complex than the GPM tent. Neither party introduced comparative data as to the costs or profits of other manufacturers on tent liners; the only data before us is that of the parent, ADC, who made some liners during the review years.

In addition, Jon-Dell did not accept renegotiable business until 1965, and it completed no renegotiable work in that year. Thus, we have only 1966 as a basis for comparison of "normal years." In 1966 Jon-Dell earned a profit of 11 percent on sales in commercial business and 9 percent on tent liners. Table VII reveals the commercial profits and losses of Jon-Dell.

A problem with comparing the commercial and renegotiable businesses of the company is the dissimilarity of business and operation, although we may consider it when we analyze the risks of entering renegotiable business attendant on Jon-Dell.

The final difficulty with Jon-Dell is that its 1967 renegotiable production is based on four contracts. Two of those contracts are "rated orders," produced and sold at government-determined prices. These two rated order contracts produced the patently high profits for Jon-Dell, and boosted the company's average profit level as shown in Table VIII.

Rated orders operate as follows. The government maintains planned producer

lists identifying firms which have the capability of manufacturing particular items. In the event of full or even partial mobilization of military production, these firms are called upon to manufacture particular items at stated prices. Usually such an order is not issued unless the government can find no bidders for their particular requirements. Prices are set in a number of ways, generally by using the average price of a recent procurement, or by determining the cost of manufacture and adding a profit figure.

Rated orders impose a heavy burden on the manufacturer in that other production and the appeasing of steady customers take a back seat to government demands. Indeed, in *Major Coat, supra* at 543 F.2d at 119, 211 Ct.Cl. at 39, plaintiff demonstrated to the court's satisfaction that the performance of rated order contracts gravely damaged good relations with regular customers.

Plaintiffs' expert, Mr. Lewis, suggested a bifurcated procedure to determine a reasonable base level of profits for Jon-Dell. He recommended establishing one profit level for the two competitively bid contracts by averaging them. That average, 15.5 percent would be applied to *sales* on those two contracts. He would then add 5 percent to this figure to allow a 20.5 percent return on the rated order contracts.

Dr. Kaitz suggested using 1966 profits as a basis for determining reasonable profits for 1967. This is the only clue to which we can turn. In 1966, returns on sales were 9.13 percent for renegotiable business, and 11.23 percent for commercial business. Return on cost for renegotiable business was 10 percent. This renegotiable business was the manufacture of general purpose small (GPS) tent liners which are easier to manufacture than the medium liners due to diminished bulk and weight. Kaitz used the 11.23 percent figure as the projected return for 1967, on projected sales of $400,000. This was the "opportunity cost" lost by Jon-Dell in entering the renegotiable business.

We decline both of the witnesses' methods. Mr. Lewis' depends too heavily on the review years' actual profits, and as we discussed above, this does not make a valid base for estimating "normal profits." Dr. Kaitz's we find too speculative. We assume then that 1966 is the closest approximation to the normal years as we can make from the record. With a 9.13 percent return on sales, and a 10 percent return on costs, we apply the percentage return on costs to 1967 costs, resulting in a base profit of $58,035.

This percentage return is higher than the one allowed for ADC, which manufactured the more complex tents. Though this is an apparent anomaly, the record indicates that greater profits were generally received in the tent accessory businesses, rather than in the tent manufacturing itself. And we will compensate ADC for its efficiency in manufacturing the more complex tents under the statutory factors.

## III

### A

The Renegotiation Act and its implementing regulations require consideration of various factors in evaluating the amount of a contractor's excessive profits. The statute stipulates efficiency as the first factor to which "favorable recognition must be given," and then lists other factors which "shall be taken into consideration." We examine first the "character of business" factor to set the stage for the other considerations.

The statute, § 1213(e)(5), requires examination of:

Character of business, including source and nature of materials, complexity of manufacturing technique, character and extent of subcontracting, and rate of turn-over.

ADC merits favorable consideration under this factor. First, although the source of plaintiffs' raw material is GFM, we discussed above the problems involved in handling GFM, and determined that use of GFM in production should not serve to eliminate profit on costs or sales as expanded by addition of GFM. Second, ADC did not

contract out its orders, except to its subsidiary, Jon-Dell. Finally, the manufacture of GPM tents was complex, not complex compared to a B–52, but complex compared to other products of the cut, make, and trim producers. A GPM tent weighs 220 pounds and the handling, cutting and sewing of the material is difficult. For the production employees, it is mean and dirty work. A total of 330 pieces of hardware is attached to the tent, and the processing of the tent materials also requires great care.

Tent liners are less complex than the tents themselves, being much lighter (92 pounds for a GPM) and requiring less hardware. However, they are still complex. The manufacture of such liners involves numerous steps and requires strict adherence to specifications. Note that the bulk of ADC's work was in the manufacture of GPM tents, while Jon-Dell made only tent liners.

We do not quantify this factor; the parties do not present any evidence as to value added, which was so useful to our approach in *Tool Products, supra.* We assume that the increase in the percentage of GPM tent-making activities for ADC resulted in a more complex production process. We also know that Jon-Dell's production of tent liners was more complex than its commercial business, the manufacture of coats. Therefore, this factor justifies a more lenient approach to profit levels for the review years, for both ADC and Jon-Dell.

### B

Both companies are entitled to very favorable recognition under the efficiency factor. 50 U.S.C.App. § 1213(e). Defendant during the review years greatly respected plaintiffs' efficiency, as is shown by its bringing in other tentage suppliers to study plaintiffs' operations and learn how they did it. Also, defendant used plaintiffs' plant to train its own inspectors, who would be sent there for varying periods. Defendant's witness, Mr. Hurchik, a procurement analyst, thought the entire plant setup was the best he had ever observed, offering the maximum degree of space utilization and allowing an "efficient flow of work."

ADC has presented sufficient evidence to back its efficiency claim, under either a base year analysis or a comparative approach. Both approaches focus on labor productivity—its increase over the prior years or its superiority over competitors. ADC's great labor productivity gains in 1967 and 1968 over its earlier performances are shown in Table IX.

Defendant argues that too much emphasis is given this increase in productivity—that it is merely the peak of a "learning curve" occurring when the rural workers traditionally employed in other fields became accustomed to and efficient at cut, make, and trim (CMT) work. In addition, it argues, ADC is benefiting from an increase in volume and the government should share in that benefit.

We find neither of these arguments convincing, in light of the comparative data available which shows that ADC continually used fewer man-hours in the manufacture of tents than its competitors. The government procurement analyst, Mr. Hurchik, testified that 32–36 hours of direct labor are required to manufacture a GPM tent. ADC spent 36.9 hours in 1966, but only 27.53 hours in 1967 and 24.06 hours in 1968 per GPM tent. Since ADC could not obtain comparable statistics from its competitors, and the government supplied none other than this testimony, an average of 34 hours is accepted as the average for ADC's competitors. Thus, for the manufacture of GPM tents, ADC was clearly more efficient than its competitors. Moreover, a credit for efficiency is necessarily due when we have selected as our "starting point" a period when plaintiffs were at an earlier point on the "learning curve" and (for 1965) subject to "down time" ravages.

No figures were available to demonstrate ADC's superior performance over competitors in the manufacture of small tents and tent liners. But as the government has failed to produce comparative figures, we rely on plaintiffs' prima facie showing of increased productivity over the normal years.

In addition to the data presented, plaintiffs also demonstrated that its management took an active role in training and organizing the labor force, and that they constantly strove to improve efficiency at their plants. ADC helped to develop a number of devices during the review years—the accordion folding device to ease flow of materials through the sewing machines, and creasers to precrease hems.

The normal assumption is that increased production of the same thing, resulting from war demand, will produce economies in unit costs, the benefit of which the government should enjoy in reduced prices, or in renegotiation. *See, e. g., Tool Products Co., supra,* 589 F.2d at 511, 218 Ct.Cl. at ——. In the case of a labor-intensive product, as here, this is not likely to be true. Additional labor must be recruited and trained, thus passing them through the early phases of the "learning curve." The heavy demand for labor will produce wage inflation. The record shows those things happened here. Prices necessarily increased. We do not have the conventional case of a producer trying to maintain prices in face of reduced unit costs. That is the case renegotiation was invented for, a case where special recognition for efficiency would be inappropriate, for the cost efficiency is achieved by outside causes, not superior management. That is not this case.

Therefore, ADC has demonstrated that it did enjoy an increase in efficiency over prior years, and so refutes any argument that greater volume is the sole cause of ADC's higher profits. The increased efficiency warrants greater profits than the normal years, and ADC's demonstrated superiority vis a vis competitors also justified favorable consideration. Therefore, we apply the trial judge's efficiency credits as calculated by him in Table IX. It might seem extreme to assign to the contractor, as that calculation does, the entire benefit from direct labor cost reduction in the form of additional profit. However, we note findings 47–51, giving comparisons with competitors, and with plaintiffs' own prior history, which show that the decreases in direct labor were exceeded by the decreases in other costs, for which no dollar credit is assigned. With the support of these findings we do not think the credits are excessive. It is evident the calculation does not deny defendant a substantial share in the overall benefit from plaintiffs' efficiency.

### Truck Division Efficiency

As discussed in the accounting section, the Truck Division of ADC charged the lowest common carrier rate to the Tent Division and still made a "profit" over its costs of 58 percent in 1967 and 60 percent in 1968. This so-called profit or net revenue in the Truck Division represents the difference between that minimum carrier rate and ADC's actual costs. We agree with the trial judge that since the bulk of Truck Division revenue was generated out of increased volume in the Tent Division, these savings in transportation costs should be shared in a renegotiation proceeding. We can easily quantify the savings. The net revenue of the Truck Division now allocated as renegotiable profits was $81,316.06 in 1967 and $80,262.81 in 1968. We give ADC a credit of 50 percent of those savings, or $40,658 in 1967 and $40,131 in 1968, under the statutory factor of efficiency.

Jon-Dell does not present such quantifiable data on efficiency. We do know that despite an untrained work force and makeshift facilities in an abandoned schoolhouse, Jon-Dell achieved quality production and met or bettered delivery schedules. And like ADC, Jon-Dell's quality of productions was so reliable that government inspections were made on a "skip lot" basis, which allowed the inspectors to check one lot and skip a number of succeeding lots at his discretion. Of all tentage manufacturers, only ADC and Jon-Dell were so classified.

As discussed in the "Character of Business" section, Jon-Dell did alter its production line, manufacturing a much more complex product. For its ability to do so with excellent delivery records, we award it an efficiency credit.

We quantify this credit by use of ADC's efficiency credit. Since the two companies

employed the same management, such a comparison is justified. The efficiency credit we granted ADC was worth 5 percent of its sales. We reduce this percentage by one percent, since ADC's production line concentrated more heavily in GPM tents, which were more complex. Applying then a 4 percent efficiency credit to Jon-Dell's sales of $811,289, we calculate an efficiency credit of $32,452 for Jon-Dell.

### C

We next consider the:

Reasonableness of costs and profits, with particular regard to volume of production, normal earnings, and comparison of war and peacetime products. [50 U.S. C.App. § 1213(e)(1).]

As regards "normal earnings," our "starting point" calculation will stand as our determination of them. The board, the trial judge, and this court all acknowledge that ADC controlled its costs well. Labor, overhead, and general and administrative costs per unit decreased from 1965–67, although not so much the increase in volume as the elimination of short runs and "down time" were partly responsible for that occurrence. ADC attempts to justify its profits by comparing costs with other producers of tents. But as Table IV illustrates, although ADC's prices rose less dramatically than its competitors, its prices were originally higher in nonreview years. The fact that ADC is virtuous vis a vis its competitors does not close our inquiry. The review years were years of heavy demand, which increased volume production and should have decreased unit costs. Merely because ADC's prices were lower than others does not mean they were established by competition or under competitive conditions. We glean from the record, as did the court in *Camel*, 572 F.2d at 300, 215 Ct.Cl. at 497, that the market for tents and tentage items was not fully competitive during the years 1966–68.

One factor—the extremely high profits enjoyed by the industry as a whole during this period—illustrates that the market lacked elements of competition. An examination in Table X of profits as a percent of

sales for ADC, Jon-Dell and other competitors shows this.

ADC's profits were high and indicative of excessive profits. So were Jon-Dell's. We do not give ADC or Jon-Dell a monetary credit for this factor, but we do assume that the cost control techniques of the two companies were rewarded under the efficiency factor.

### D

The statute requires us to take into consideration the contractor's net worth, "with particular regard to the amount and source of public and private capital employed." 50 U.S.C.App. § 1213(e)(2).

The board did mention that no government assistance was received by ADC or Jon-Dell in the form of machinery, equipment, or financial assistance. Both companies were furnished GFM, which did prevent the need for some investment of capital, and we can take this fact into account as a qualitative consideration. *Major Coat Co. v. United States*, 543 F.2d at 107–08, 211 Ct.Cl. at 19–20. With its own financing, ADC also built a new plant for $170,000 and spent an additional $93,000 for plant and equipment. This latter factor will come under consideration in our discussion of "risk."

The findings show a high ratio of profit to beginning net worth for each year. Both plaintiffs and defendant agree that the use of net worth and capital employed ratios is of dubious value in this case, as the industry was labor and not capital intensive. *See A. C. Ball. Co. v. United States*, 531 F.2d 993, 1011, 209 Ct.Cl. 223, 256 (1976). Defendant did not show that other companies in the industry employed more capital than plaintiffs in ratio to sales, and did not before us claim the factor was other than neutral, so we leave it at that.

### E

We examine next the extent of risk assumed by the parties. 50 U.S.C. app. § 1213(e)(4).

We do not find convincing plaintiffs' arguments that ADC or Jon-Dell undertook any considerable risks by bidding for and accepting fixed price contracts, by using GFM, or in granting warranties. The margin of profit was more than sufficient to cover all such risk, and remains sufficient with the reductions we are proposing. All its competitors encountered the same risks and we find no proof of any unique risks to ADC or Jon-Dell on the facts of this case. As this court stated in *Major Coat Co., supra*:

> * * * [T]he presence of risk common to all will not entitle the contractor to more or less profit than is merited by an otherwise comparable firm; compensation for those risks, to the extent the market will permit, is already internalized in the comparable firm's profit figure. * * * [543 F.2d at 117, 211 Ct.Cl. at 37.]

The contracts placed under rated orders, *i. e.*, involuntary, were more generously priced than the contracts ADC bid for, to the extent the trial judge thought all the excessive profits were earned under such rated orders. One risk which is often cited is compensable in renegotiation cases is the risk of loss of alternative businesses. It is difficult to analyze ADC's and John-Dell's risk in that their alternative commercial ventures which they "sacrificed" in order to manufacture military tentage were not demonstrably successful. ADC was established in 1951; it only ventured out of renegotiable business in the early 1960's, when it attempted to produce water safety, furniture, and other miscellaneous products. Its commercial business was profitable only from 1963–65. And after a peak percentage return on sales of 11.9 percent in 1963, its return rate on sales declined.

Jon-Dell enjoyed commercial profits in 1965 (2.1 percent on sales) and in 1966 (11.23 percent). Plaintiffs argue that Jon-Dell was entering a potentially profitable period when it entered renegotiable business, and it sacrificed those potential profits. But the record indicates that Jon-Dell was experiencing difficulties in commercial production and financing, and took on renegotiable business in 1965 to keep its facility operating. As entry into renegotiable business prevented Jon-Dell's closing, and altered its extremely poor capital position, the risks of remaining in renegotiable business are offset.

Although we agree with the government that since both companies had little to lose in their commercial endeavors, they did not risk a loss of opportunity, this does not totally eliminate a credit for risk. As was stated in *Butkin Precision Mfg. Corp. v. United States*, 544 F.2d 499, 508, 211 Ct.Cl. 110, 126 (1976):

> * * * [T]he risk factor was not designed to reward altruistic contractors only. It was based on the well known fact that persons who invest in a risky enterprise can command more return than those who invest in enterprises free from risk.

And some risks are greater for small nondiversified firms who devote all resources and managerial capabilities to renegotiable contracts.

Two risks undertaken by plaintiffs are the risk of overexpansion and that of total discontinuance of operations. Both companies did greatly expand their business, and when this occurs, there is often not enough capital to meet operating costs. ADC's sales increased by about 300 percent from 1966 to 1968. Jon-Dell's 1967 sales increased 100 percent over 1966. But both companies' capital positions were less threatened by overexpansion than manufacturers who had to make outlays for raw materials; GFM alleviated this burden.

Other expansion plans which might form compensable risk are the increased outlays for plant and equipment made by ADC in the review years, with a total investment of $263,000. This risk of overexpansion is a serious one, especially in light of the required fiscal year method of redetermining renegotiable profits; *see Butkin Precision Mfg. Corp., supra*, 544 F.2d at 508–09, 211 Ct.Cl. at 127.

This risk of overexpansion is related to the risk of a total cessation of government

demand for the manufacturer's product. A drastic decline in demand did occur in the tent business. Tent orders declined from a peak of 120,528 in 1966 to 22,938 in 1969. ADC's new plant was closed in March 1968. Value of plant and equipment left idle in 1968, depreciated to June 30 was $340,000. Plaintiffs went out of business. Plaintiffs' fixed assets, book value of $593,421 were sold separately. The plant went in 1974 for $375,000. Some of the machinery had never been sold at the date of trial.

The government counters, however, that the book value of owner's equity (stock and retained earnings) increased substantially through the review years and more than adequately compensated plaintiffs for their losses, by providing a liquid basis from which they could regroup and diversify or liquidate their assets. The owner's equity in ADC was $275,000 in 1966, $961,000 in 1967, and $1,972,000 in 1968. Jon-Dell's equity increased from approximately $50,000 to $150,000. This does largely compensate plaintiffs for the risks encountered, even though any downward redetermination of plaintiffs' profits would decrease these figures. In a labor intensive business such as this was, value of plant and equipment was minimal in relation to the business done, and risk of loss on going out of war business was amply covered by the retained profit we allow.

## F

■ Our final focus is on plaintiffs' contribution to the defense effort. Plaintiffs urge credit for this factor because they opened their plants to other manufacturers and in general were cooperative and useful to the government in the quick and efficient procurement of badly needed tentage items. This court in *Camel* deemed these contributions worthy of credit, although it did not quantify the credit. 572 F.2d at 306, 215 Ct.Cl. at 506–07. We note, however, that most of the experienced contractors in the tentage field were helpful to the government in the manner suggested above. They had little to lose in the short run by opening their plants for inspection or by advising competitors—there was no competition for orders, each contractor had more than enough to fill capacity. And note that the regulation, 32 C.F.R. § 1460.-13, emphasized that contractors are to be rewarded for:

> * * * [O]vercoming difficulties, *which others have failed to overcome in providing materials or services for the defense effort*; * * . *. [Emphasis supplied.]

With the exception of ADC's value engineering proposal discussed below, plaintiffs have shown no special skills or demonstrated the ability to do a job which another contractor could not. *Compare Tool Products Co. v. United States*, 589 F.2d at 510, 218 Ct.Cl. at ——. Methods of other contractors were different and perhaps less efficient, but they produced every end item plaintiffs produced.

The value engineering proposal does merit favorable consideration. This was deemed by the trial judge to have originated with ADC and to be worth a credit of $7,387 and $8,215.

The proposal suggested substitution of No. 6 Rulled Rim Grommets with Spur Washers in place of 16 hand-worked rings. It resulted in reduced labor costs, and increased standardization. When the government incorporated the change into a contract offered in 1966, it indicated that it would reduce the price by 88 cents per tent. The trial judge multiplied this savings per tent by the number of tents produced incorporating this change in 1967 and 1968. One-half the savings credit was awarded ADC.

Defendant argues that except for a 1965 letter from ADC there is no evidence that the idea originated with ADC or that it was adopted due to ADC's efforts. Given evidence of the letter and the government's use of it, we think ADC has made its prima facie case here, and defendant has presented no evidence to contradict it. We also give ADC and Jon-Dell a $2,000 credit for each review year for their contribution to the defense effort.

The final determination of excessive profits for the two companies is set forth in Table XI.

The final check on the reasonableness of our determination of excess profits requires a "sideways glance" at the fate of ADC and Jon-Dell's competitors. Post-renegotiation board profits as a percent of sales (including GFM) for other tentage products manufacturers were as follows:

Peoples Company

| 1966 | 7.71% |
| 1967 | 6.03% |

Virginia Tent & Awning Co.

| 1967 | 5.98% |
| 1968 | 4.76% |

Wilson Manufacturing Co.

| 1967 | 6.62% |
| 1968 | 5.08% |

Camel Manufacturing Co.

| 1966 | 6.80% |
| 1967 | 5.21% |
| 1968 | 6.97% |

This court determined excessive profits for Camel, with the resulting returns of 8.30 percent, 8.60 percent, and 10.60 percent on adjusted sales for 1966, 1967, and 1968, respectively. (These percentage figures are this panel's calculations, not given in the *Camel* opinion as published.) Not only did Camel compete with ADC in supplying the same products for the war effort, but the same able counsel contended on both sides. Defendant had a different expert in each case. With the failure of defendant's expert here to come to grips with the statutory factors, it may be the few days by which the trial preceded the *Major Coat* decision are all that saved defendant from a clearance. It is arguable that Camel's returns cannot be compared as it did not break down its data on a contract basis, and that production costs for tents and other tentage items varied widely, preventing intra-product comparisons. But we recognize that renegotiation requires some flexibility, and while we do not use competitors' figures as a definitive basis for comparison, we do consider them to determine if our figures are "in the ballpark."

 Although ADC's and Jon-Dell's final profits after renegotiation are higher than their competitors', they appear to have been deservedly so. ADC's and Jon-Dell's profit levels before renegotiation were higher than Camel's on lower unit prices; in addition, their strong showing of superior efficiency (and the quantification of that efficiency) pulls them ahead. Both Camel and ADC fared much better here than with the board, but it is impossible to speculate whether the others named would have done so too.

## CONCLUSION

Defendant is entitled to recover on its counterclaim the following amounts with respect to each of the plaintiffs for the review years stated:

ADC

| 1967 | $739,536 |
| 1968 | 873,206 |

Jon-Dell

| 1967 | $137,988 |

These amounts are subject to appropriate adjustment and credit for state and federal income taxes. The cause is remanded to the trial division under Rule 131(c) for computation of said amounts.

TABLE I

Government Tent Contracts

| Year | No. of Units Awarded |
| --- | --- |
| 1960 | 10,700 |
| 1961 | 16,605 |
| 1962 | 5,370 |
| 1963 | 9,870 |
| 1964 | 2,950 |
| 1965 | 37,465 |
| 1966 | 120,528 |
| 1967 | 61,720 |
| 1968 | 22,938 |

## TABLE II

### Government Estimates of ADC's Profits

| Year | Sales (000) GFM Included | Sales (000) GFM Excluded | Profits (000) | GFM Included | GFM Excluded |
|------|-------------------------|--------------------------|---------------|--------------|--------------|
| 1962 | $ 2,829 | $ 1,145 | $ 85 | 3.00% | 7.42% |
| 1963 | 1,411 | 670 | (43) | (3.03) | (6.42) |
| 1964 | 808 | 459 | (36) | (4.45) | (7.84) |
| 1965 | 1,490 | 914 | 86 | 5.77 | 9.41 |
| 1966 | 2,563 | 1,494 | 199 | 7.76 | 13.32 |
| 1967 | 7,895 | 4,050 | 1,342 | 17.00 | 33.14 |
| 1968 | 11,029 | 5,372 | 2,056 | 18.64 | 38.27 |

## TABLE III

### Effect of Truck Division Accounting on Profit Margins

| | 1967 | 1968 |
|--|------|------|
| Total profit-per plaintiff and defendant | $1,410,290.21 | $2,134,806.91 |
| Renegotiable profit-per plaintiff | 1,342,505.46 | 2,055,868.72 |
| Renegotiable profit-per defendant (Includes Truck Division) | 1,423,821.52 | 2,136,131.53 |
| Difference | 81,316.06 | 80,262.81 |
| Profit/Sales % per plaintiff | 17.00% | 18.64% |
| Profit/Sales % per defendant | 18.03% | 19.36% |

## TABLE IV

### Price Increases of ADC and Its Competitors

| Manufacturer | 1961–1965 Average CMT Price | 1966–1968 Average CMT Price | Amount of Increase | Percent Increase |
|--------------|------------------------------|------------------------------|--------------------|------------------|
| Wilson | $ 122.38 | $ 190.91 | $ 68.53 | 56 % |
| ADC | 152.36 | 197.30 | 44.94 | 29.5 |
| Peoples | 148.09 | 198.00 | 49.91 | 33.7 |
| Virginia Tent | 145.00 | 223.37 | 78.37 | 54 |
| Camel | 150.31 | 246.29 | 95.98 | 63.9 |

## TABLE V

### ADC's Renegotiable Sales, Costs and Profits
### GFM Included

| Year | Sales | Costs | Profit | Profit % Sales | Profit % Cost |
|---|---|---|---|---|---|
| 1962 | $ 2,829,533 | $ 2,712,722 | $ 85,484 | 3.0 | 3.15 |
| 1963 | 1,418,960 | 1,481,024 | (43,220) | (3.04) | (2.92) |
| 1964 | 808,094 | 860,810 | (35,891) | (4.44) | (4.17) |
| 1965 | 1,489,797 | 1,442,044 | 86,225 | 5.78 | 5.98 |
| 1966 | 2,562,596 | 2,382,024 | 199,450 | 7.78 | 8.37 |
| 1967 | 7,894,726 | 6,524,631 | 1,423,821 | 18.03 | 21.82 |
| 1968 | 11,029,172 | 9,001,981 | 2,136,131 | 19.36 | 23.73 |

1966 GPM Tent Sales

| Year | Sales | Costs | Profit | Profit % Sales | Profit % Cost |
|---|---|---|---|---|---|
| 1966 (2 GPM Contracts) | 1,922,878 | 1,822,660 | 100,187 | 5.21 | 5.49 |

## TABLE VI

### Base Profits Estimated by Court's Analysis and Other Witnesses

| Description of Method | 1967 | 1968 |
|---|---|---|
| 8% return on costs without GFM (Hurchik) | $ 214,417 | $ 267,586 |
| 12% return on costs without GFM (Lewis) | 321,626 | 401,380 |
| 5.79% (1967) + 5.99% return on costs with GFM (Court) | 377,776 | 539,219 |
| 6% return on costs with GFM | 391,478 | 540,119 |
| 8% return on costs with GFM | 521,970 | 720,158 |
| 12% return on costs with GFM | 782,956 | 1,080,238 |

## TABLE VII

### Jon-Dell's Commercial Business

| Year | Profits as % of Sales |
|---|---|
| 1964 | (12.96%) |
| 1965 | 2.21 |
| 1966 | 11.23 |
| 1967 | 5.18 |

## TABLE VIII

### Jon-Dell's Renegotiable Contracts for 1967

| Contract | No. of Units | Sales | Costs | Profits | As a % of Sales | As a % of Costs |
|---|---|---|---|---|---|---|
| DSA–2027 | 1,870 | $121,451 | $104,386 | $ 16,996 | 14.00% | 16.28% |
| DSA–4552 | 600 | 111,510 | 93,690 | 17,756 | 15.92 | 18.95 |
| DSA–0921* | 2,250 | 476,485 | 311,145 | 165,068 | 34.64 | 53.05 |
| DSA–1119* | 484 | 101,843 | 71,130 | 30,655 | 30.10 | 43.09 |
| Totals | 5,204 | $811,289 | $580,351 | $230,475 | 28.40% | 39.71% |

* Rated orders

## TABLE IX

### ADC's Improved Efficiency

**GPM Tents**

| FY | Direct Labor Hrs. | No. Tents | Hrs./ Tent | Hrs. Saved Over 1966 | Hrs. Saved Times No. Tents | Hourly Wage Rate | Total Credit |
|---|---|---|---|---|---|---|---|
| 1966 | 239,296.75 | 6,474 | 36.96 | --- | --- | $1.49 | --- |
| 1967 | 462,202.75 | 16,788 | 27.53 | 9.43 | 158,311 | 1.62 | $256,464 |
| 1968 | 439,434.25 | 18,671 | 23.53 | 13.43 | 250,752 | 1.82 | 456,369 |

**GPM Tent Liners**

| FY | Direct Labor Hrs. | No. Tents | Hrs./ Tent | Hrs. Saved Over 1966 | Hrs. Saved Times No. Tents | Hourly Wage Rate | Total Credit |
|---|---|---|---|---|---|---|---|
| 1966 | --- | --- | --- | --- | --- | --- | --- |
| 1967 | 71,020 | 4,136 | 17.17 | --- | --- | --- | --- |
| 1968 | 127,181 | 9,474 | 13.42 | 3.75 | 35,527.5 | 1.82 | 64,659 |

**GPS Tent Liners**

| FY | Direct Labor Hrs. | No. Tents | Hrs./ Tent | Hrs. Saved Over 1966 | Hrs. Saved Times No. Tents | Hourly Wage Rate | Total Credit |
|---|---|---|---|---|---|---|---|
| 1966 | --- | --- | --- | --- | ---- | --- | --- |
| 1967 | 22,463 | 2,071 | 10.84 | --- | --- | --- | --- |
| 1968 | 90,429 | 16,065 | 5.63 | 5.21 | 83,699 | 1.82 | 152,332 |

| | |
|---|---|
| Total Credit for Efficiency | $929,824 |
| Total Credit for 1967 Review Year | $256,464 |
| Total Credit for 1968 Review Year | 673,360 |
| | $929,824 |

These savings are demonstrated solely by savings in direct labor
costs, although savings in other cost areas are also demonstrated
in the findings.

### TABLE X

#### Profits as a Percent of Sales (All excluding GFM) *

| Year | Peoples Co. | Virginia Tent | ADC | Jon-Dell |
|---|---|---|---|---|
| 1965 | 7.5% | --- | --- | --- |
| 1966 | 16.3 | 9% | 9.5% | 20.7% |
| 1967 | 21.9 | 16.8 | 35 | 50.9 |
| 1968 | 39.1 | 18.9 | 36 | --- |

* Obtained from Renegotiation Board Figures.

### TABLE XI

#### Excessive Profits Calculations Summary

| ADC | 1967 | 1968 |
|---|---|---|
| Sales (including GFM) | $ 7,894,726 | $11,029,172 |
| Costs (including GFM) | 6,524,632 | 9,001,980 |
| Renegotiable Profits | 1,423,821 | 2,136,131 |
| (A) Base Profit Level | | |
| 1967—5.79% of Costs | 377,776 | |
| 1968—5.99% of Costs | | 539,219 |
| (B) Statutory Factor Credits | | |
| Efficiency | 256,464 | 673,360 |
| Truck Division Efficiency | 40,658 | 40,131 |
| Value Engineering Proposal | 7,387 | 8,215 |
| Defense Effort Contribution | 2,000 | 2,000 |
| Reasonable Profits | 684,285 | 1,262,925 |
| Excessive Profits | 739,536 | 873,206 |
| Adjusted Sales | 7,155,190 | 10,155,966 |
| Profit as percent of Adjusted Sales | 9.56% | 12.44% |

| JON–DELL | 1967 |
|---|---|
| Sales (including GFM) | $ 811,289 |
| Costs (including GFM) | 580,351 |
| Renegotiable Profits | 230,475 |
| (A) Base Profit Level | |
| 10% of Costs | 58,035 |
| (B) Statutory Factors | |
| Efficiency | 32,452 |
| Defense Effort | 2,000 |
| Reasonable Profits | 92,487 |
| Excessive Profits | 137,988 |
| Adjusted Sales | 673,301 |
| Profit as percent of Adjusted Sales | 13.74% |